Morrison, C. J.,
delivered the opinion of the Court:
The return of the writ in this case shows that the petitioner is held under a commitment issued by Robert E. Warren, a justice of the peace of Butte county, on a judgment of conviction rendered on the fifth day of August, 1881, and that the offense, of which the petitioner was convicted, was that of “keeping open a saloon on Sunday for the purpose of transacting business therein.”
The section of the Penal Code under which the prosecution and conviction were had, reads as follows: “ Every person who keeps open on Sunday; any store, workshop, bar, saloon, banking-house, or other place of business for the purpose of transacting business therein, is punishable by fine not less than five, nor more than fifty dollars.” Section 300.
The proceedings, including the complaint, judgment, and commitment, are regular upon their face, and can only be attacked in this proceeding by habeas corpus, on the ground that the act upon which the prosecution was founded, is obnoxious to some constitutional provision.
In the first place, it is claimed on behalf of the petitioner that the act violates Section 25, Article IV of the Constitution, inasmuch as it is a special law, and is therefore repugnant to Section 25, Article IV, which declares that “the Legislature shall not pass local or special laws in any of the following cases : “ First —Regulating the jurisdiction and duties of justices of the peace, etc. Second—-For the punishment of crimes and misdemeanors.” * * *
At the time the law in question was passed, there was no constitutional objection to special and local legislation. This was held by the Supreme Court in the very early case of Ryan v. Johnson, 5 Cal., 87, and the same doctrine was again laid down in the case of The People v. C. P. R. R. Co., 43 Cal., 398. When the act was passed it was a valid act, even conceding for the *152 purposes of the argument that it was a special law, as is claimed in this case. The question therefore arises, was the act abrogated by the provision of the new Constitution referred to above? The language of Section 25, Article IV, is that “the Legislature shall not pass local or special laws,” The constitutional inhibition manifestly applies to future and not to past legislation. The provision is purely and simply prospective in its operation, and the words will not justify any other construction. It did not, therefore, operate as a repeal of acts passed by the Legislature years before the Constitution went into effect, but merely put a stop to all future legislation of that objectionable character. If authority were required in support of this view, it will be found in the following cases: Allbyer v. The State, 10 Ohio State, 588; The State v. Barbee, 3 Ind., 258; Hingle v. The State, 24 Id., 28; Cooley’s Const Lim., 76.
In the first of these cases the Supreme Court of Ohio says: “It is provided by Section 26, Article II, of the Constitution of 1851 of this State, as follows: ‘All laws of a general nature shall have a uniform operation throughout the State; nor shall any act, except such as relates to public schools be passed, to take effect upon the approval of any other authority than the General Assembly, except as otherwise provided in this Constitution.’ And it is also provided by Section 1 of the schedule of the Constitution, that ‘all laws of this State in force on the 1st day of September, 1851, not inconsistent with this Constitution, shall continue in force until amended or repealed.’ The act of March 7, 1835, under which the plaintiff is sentenced, was in force on the 1st day of September, 1851, and therefore continued to be, and is in full force, unless the same was inconsistent with the Constitution, and so thereby abrogated. The inquiry then arises, Was that special act so inconsistent with the provisions of Section 26, Article II, of the Constitution as to be thereby annulled, and cease to be in force after the 1st day of September, 1851? All of Article II of the Constitution of 1851 is directed to the subject of legislative powers and duties. But it has respect to future legislative bodies rather than to past, under the former Constitution. And Section 26 is evidently in its provisions applicable to future rather than existing legislative enactments. Immediately following the words, ‘all laws of a general nature shall have a uniform operation throughout the State,’ and *153 as part of the same sentence are the following: ‘ Nor shall any Act, except such as relates to public schools, be passed, to take effect upon any other authority than the General Assembly, except as otherwise provided in this Constitution;’ showing evidently that the provisions of the section have respect to future and not past legislation. Indeed, any other construction of Section 26, of Article II, of the Constitution, would lead to setting aside the most of the. special laws of the State; a consequence which the provident and intelligent body of men who framed "the Constitution could not have failed to perceive and would surely have avoided.”
In the above case the Court had under consideration an act of the Legislature of Ohio, passed on the 7th day of March, 1835, for the more effectual punishment of certain offenses in the county of Hamilton, and held the same valid.
The next case to which I will refer is that of The State v. Barbee, 3 Indiana, 258, which arose under a provision of the Constitution of that State. By Section 22, Article IV, of the Constitution of the State of Indiana, it is provided that the General Assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: “For the punishment of crimes and misdemeanors,” etc.; and the following section of the same article provides as follows: “In all the cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the State.” The defendant was indicted, under a local statute, passed before the adoption of the new Constitution, and the indictment was quashed by the Circuit Court on the ground that the law was local in its operation, and hence was abrogated by the new Constitution, adopted in Augúst, 1851. -An appeal was taken on behalf of the people, and the Supreme Court of Indiana sustained the law, saying: “We are satisfied that Sections 22 and 23, of Article IV, of the Constitution, should be construed to operate prospectively. This being the case, the next question presented is, whether local laws existing at the taking effect of the new Constitution, are inconsistent with provisions in said Constitution prohibiting the passage, by future Legislatures, of local laws? We do not understand the affirmative of this proposition to be *154 contended for, and we think it cannot be, successfully. Existing local laws, then, being not inconsistent with the present Constitution, are expressly continued in force by it. The first provision of the Schedule annexed to said Constitution, as a part thereof, declares: ‘That no inconvenience may arise from the change of the government, it is hereby ordered as follows: First, all laws now in force, and not inconsistent with this Constitution, shall remain in force until they shall expire or be repealed.’ It is the unanimous opinion of the Court that the decision of the Court below must be reversed.”
It will be observed that the provision of the Indiana Constitution which received a judicial interpretation in the case of The State v. Barbee was precisely similar to that found in our own Constitution; and the case is, therefore, an authority directly in point.
On the question whether the act is general or special legislation, it is not necessary to decide. But I must not be understood as admitting that the act is special in its character; and will refer to a few authorities on the point.
“A general or public act, regards the whole community; special or private acts relate only to particular persons or to private concerns. Public acts, the Courts of justice are bound ex officio to notice, without their being set forth. Of private acts, the judges are not bound to take notice unless they be generally shown and pleaded.” (Potter’s Dwarris on Stat. and Const. Law, 53.) Mr. Blackstone, in his Commentaries, says: “Statutes are either general or special, public or private. A general or public act is an universal rule, that regards the whole community; and of this Courts of law are bound to take notice judicially and ex officio, without the statute being particularly pleaded or formally set forth by the party who claims an advantage under it. Special or private acts are rather exceptions than rules, being those which only operate upon particular persons and private concerns; such as the Romans entitled senatus de-creta in contradistinction to senatus consulta, which regarded the whole commuuity. * * * Thus, to show the distinction, the statute 13 Eliz. C., 10, to prevent spiritual persons from making leases for longer terms than twenty-one years, or three lives, is a public act; it being a rule prescribed to the whole body of spiritual persons in the nation; but an act to ena *155 ble the Bishop of Chester to make a lease to A. B., for sixty years, is an exception to this rule; it concerns only the parties and the Bishop’s successors, and is therefore a private act.” (Sharwood’s Blackstone’s Comm., 85.) Again, it is said in a note to the same page of Book 1, that “the distinction between public and private acts is marked with admirable precision by Mr. Abbot (afterwards Lord Colchester):
“1, In legal language acts are deemed to be public and general acts which the Judges will take notice of without pleading, viz: Acts concerning the King, the Queen, arid the Prince; those concerning all prelates, nobles, and great officers; those concerning the whole spirituality, and those which concern all officers in general, such as all sheriffs, etc. Acts concerning trade in general, or any specific trade, etc. 2. Private acts are those which concern only a particular species, thing, or person, viz: Acts for toleration of dissenters; acts relating to any particular place, or to divers particular towns, or to one or divers particular counties, or to the colleges only in the universities.”
In Hingle v. The State, 24 Ind., 34, the Court says: “What is a special act? It is such as at common law the Courts would not notice, unless it were pleaded and proved like any other act. * * The distinction between general and special statutes was well known at common law, though sometimes a question of great nicety; and it is in accordance with a well established principle to assume that the Constitution, in using the terms, intended them to be understood in the sense which was at the time recognized by the Courts. Now, we apprehend that it will be impossible, anywhere, to find a decision by any respectable Court to the effect that an act is required to be pleaded which confers jurisdiction for the punishment of a particular misdemeanor, in all cases, though the Court thus empowered could not take cognizance of other misdemeanors. * * Here all persons are bound by this law, and all, without distinction, who become amenable to its penalties, are liable to be tried' in either Court. * * * The act creates a class of offenses belonging to that general division of offenses known as misdemeanors.”
Second objection: That the act is void, under Section 11, Article 1, of the Constitution. On this point I will refer to the cases of Brooks v. Hyde, 37 Cal., 366, and Ex parte Smith and *156 Keating, 38 Cal., 702, as to the meaning of that provision of the Constitution which declares that “all laws of a general nature shall have a uniform operation.”
It is true that Section 301 of the Penal Code excepts from the operation of the law certain kinds of business, but this it was perfectly competent for the Legislature to do, without violating the constitutional provisions respecting uniformity. The act prohibits the carrying on of certain kinds of business on Sunday, throughout the State. The law extends over the entire State, and applies to all persons in the State. It is therefore uniform in its operation, and I can see no good reason why the Legislature might not prohibit drinking-saloons, billiard-rooms, and ten-pin alleys from being kept open for the transaction of their regular business on Sunday, and, at the same time, permit drug stores and hotels to remain open, without violating the clause requiring uniformity in the operation of all laws of a general nature.
In view of the foregoing cases, and the principles established by them, I am forced to the conclusion that the act in question does not violate either of the two clauses of the Constitution already discussed in this opinion.
3. There remains another objection to the act, which I will now proceed to notice.
Article I, Section 4, of the Constitution, declares that “the free’exercise and enjoyment of religious profession and worship, without discrimination or preference, shhll forever be guaranteed in this State;” and the language of the 4th Section of Article I, of the Constitution of 1863, was precisely the same totidem ver-bis.
Indeed, it is said by Mr. Kent, in Volume 1, p. 633, of his Commentaries, that “the free exercise and enjoyment of religious profession and worship may be considered as one of the absolute rights of individuals, recognized in our American Constitutions, and secured to them by law. Civil and religious liberty generally go hand in hand, and the suppression of either of them, for any length of time, will terminate the existence of the other. It is ordained by the Constitution of the United States that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, and the same principle appears in all the State Constitutions. The principle is *157 generally announced in them without any kind of qualification or limitation annexed, and with the exclusion of every species of religious test.”
It is very clear, therefore, and no one would have the presumption to deny the proposition, that if the act now under consideration does in any manner interfere with the free exercise and enjoyment of religious profession and worship, it is unconstitutional and absolutely void. But it has been held over and over again, in numerous States of the Union, that an act prohibiting the keeping open of certain places of business on Sunday is not a religious regulation, and that such an act in no way interferes with the free enjoyment of religious profession and worship. It is purely a secular, sanitary, or police regulation, and has been too frequently upheld as such, to be shaken at the present day. Mr. Cooley, in his able work on Constitutional Limitations, uses the following language: “The laws which prohibit ordinary employments on Sundays are to be defended either on the same grounds which justify the punishment of profanity, or as establishing sanitary regulations, based upon the demonstration of experience that one day’s rest in seven is needful to recuperate the exhausted energies of body and mind. If sustained on the first ground, the view must be that such laws only require the proper deference and regard which those not accepting the common belief may justly be required to pay to the public conscience. The Supreme Court of Pennsylvania has preferred to defend such legislation on the second ground rather than the first; but it appears to us that if the benefit to the individual is alone to be considered, the argument against the law which he may make, who has already observed the seventh day of the week, is unanswerable. But, on the other ground, it is clear that these laws are supportable on authority— notwithstanding the inconvenience which they occasion to those whose religious sentiments do not recognize the sacred character of the first day of the week” (594-5.) Again the same author, at page 734, says: “Sunday Laws.—We have elsewhere referred to cases in which laws requiring all persons to refrain from their ordinary callings on the first day of the week have been held not to encroach upon the religious liberty of those who do not observe that day as sacred. Neither are they unconstitutional as a restraint upon trade and commerce, or be *158 cause they have the effect to destroy the value of a lease of property to be used on that day, or to make void a contract for Sunday services. There can no longer be any question, if there ever was, that such laws may be supported as regulations of police.”
The text of the learned treatise on Constitutional Limitations is supported by authorities too numerous and powerful to be successfully attacked at the present day. It is true that they are not uniform in the view that the acts can be sustained from a religious standpoint, and upon religious grounds, but they are uniform in holding that such a law does not violate any constitutional provision. By some of the authorities it is held that Christianity is a part of the common law of this country, and by others that it is not; while another view is, that Christianity is a part of our common law in only a qualified sense. “Still, though Christianity is not the religion of the State, considered as a political corporation, it is nevertheless interwoven into the texture of our society, and is intimately connected with all our social habits and customs and modes of life.” Sedgwick’s Const, and Stat. Law, 14.
I cannot do more than briefly refer to a few of the very numerous authorities on the question now under discussion.
In the case of City Council of Charleston v. Benjamin, 2 Strobhart’s, 508, it was held that “an ordinance of the City Council of Charleston making it a penal offense for any person to expose to sale, or sell in any shop, etc., any goods upon ‘the Lord’s day,’ ‘commonly called Sunday,’ is not a violation of the First Section of the Eighth Article of the Constitution of this State.” That Article is in the following language: “The free exercise and enjoyment of religious preference and worship without discrimination or preference, shall forever hereafter be allowed within this State to all mankind.”
The next case is Shover v. The State, 5 Eng., 259, and it was there held by the Supreme Court of Arkansas, that “ the Christian religion is recognized as constituting a part of the common law; its institutions are entitled to profound respect and may well be protected by law. The Sabbath, properly called the ‘ Lord’s Day,’ is amongst the first and most sacred institutions of Christianity, and the act for the punishment of Sabbath break *159 ing is n'ot in derogation of the liberty of conscience secured to the citizens by the 3d Section of the Declaration of Rights.”
In Frolickstein v. The Mayor of Mobile, 40 Ala., 725, the Supreme Court of Alabama say: “A statute or municipal ordinance prohibiting the sale of goods by merchants on Sunday in its application to religious Jews, ‘who believe that it is their religious duty to abstain from work on Saturday, and to work on all the other six days of the week,’ is not violative of the 3d Section of the 1st Article of the State Constitution, which declares that no person shall ‘upon any pretense whatever, be hurt, molested, or restrained of his religious sentiments or persuasions.’ ”
The Court in this case say that “the legislation on the subject of abstaining from worldly employment on the first day of the week is referred to the police power of the Legislature. It has its sanction in the teaching of experience, that the general welfare and the good of society require a suspension of labor and business for one day in seven, and that day should be one of uniform observance. The exercise of the power to enforce this theory of public good would not infringe the Constitution, whether the designated day should be the Christian or Jewish Sabbath.”
In the Stale v. Ambs, 20 Mo., 219, the learned Judge delivering the opinion of the Court, in which the validity of the Sunday law was sustained, remarks: “How startling would the announcement be to the people of Missouri that, by their organic law, they had abolished Sunday as a day of rest, and had put it out of the power of the Legislature ever to notice it as such ? With what sorrow would the toil-worn laborer receive the intelligence that there was no longer by law a day of rest from his labor? The poor beast of burden would soon find by experience that our laws were no longer tempered by the softening influences of Christianity, and all the social advantages which great and good men have attributed to the observance of Sunday as a day of rest would be taken away.”
The foregoing are some of the cases to be found in the reports of the Southern States, and they are in this respect the views of Southern Judges, in no manner influenced by sectarian or puritanical ideas. The same current of authority runs through the cases to be found in the legal reports of the Eastern, Western, and Middle States.
*160 In Toule v. Larrabee, 26 Maine, 464, the Court held a promissory note, made on the Lord’s day, given and received as the consideration for articles purchased on that day, as void, the act done being in violation of law.
In Connecticut, contracts made on the Lord’s day have been decided to be invalid. Wright v. Geer, 1 Root, 474; Fox v. Abel, 2 Conn., 584.
The case of Hudson v. Geary, 4 R. I., 484, sustained an ordinance of the city of Providence prohibiting the opening of places of trade or entertainment on Sunday.
In the case of the Commonwealth v. Has, 122 Mass., 40—a very recent case—it was held that the provisions of the general statutes, Ch. 84, p. 1, prohibiting the keeping open a shop on the Lord’s day is constitutional, and the learned Judge there remarks : “ While in the Constitutions of many States of the Union there are, in different forms, provisions that no preference shall be given to any religion or form of religious belief, acts for the observance of the first day of the week as a day of rest from labor, have been repeatedly passed. In all of them, so far as we have been able to examine, the constitutionality of such acts has been sustained.”
In New York the same doctrine has been sustained by the Courts. Speaking of a Sunday law in the case of Lindenmuller v. The People, 53 Barb., 548, the Court say; “But as a civil and political institution, the establishment and regulation of a Sabbath is within the just powers of the civil government. * * * It is a law of our nature that one day in seven must be observed as a day of relaxation and refreshment, if not for public worship. Experience has shown that the observance of one day in seven as a day of rest is of admirable service to a State, considered merely as a civil institution. (4 Bl. Com., 63.) * * * The stability of government, the welfare of the subject, and the interest of society have made it necessary that the day of rest observed by the people of a nation should be uniform, and that its observance should be to some extent compulsory, not by way of enforcing the conscience of those upon whom the law operates, but by way of protection to those who desire and are entitled to the day. The necessity and value of the Sabbath is acknowledged by those not professing Chris *161 tianity. * * * As a civil institution the selection of a day is at the option of the Legislature; but for a Christian people it is highly fit and proper that the day observed should be that which is regarded as the Christian Sabbath.”
To the same effect is the rule laid down by the Supreme Court of Pennsylvania in Commonwealth v. Woolf, 3 S. & R., 47, Specht v. Commonwealth, 8 Barr, 312, in which it is said: “But it is argued, with apparent conviction of its truth, that to compel men to refrain from labor, solely from regard to the imputed holiness of a particular day is within the meaning of the Constitution, ‘to control’ the religious observance and to ‘interfere with and constrain the consciences of those who honestly disbelieve the asserted sanctity of the selected day.’ We cannot assent to this. So long as no attempt is made to force upon others the adoption of the belief entertained by the governing power, or to compel a practice in accordance with it, so long is conscience left in the enjoyment of its natural right of individual decision and independent religious action. * * * It inter-meddles not with the natural and indefeasable right of all men to worship Almighty God according to the dictates of their own consciences; it compels none to attend, erect, or support any place of worship, or to maintain any ministry against his consent; it pretends not to control or interfere with the rights of .conscience, and it establishes no preference for any religious establishment or mode of worship. It treats no religious doctrine as paramount in the State; it enforces no unwilling attendance upon the celebration of Divine worship. It says not to the Jew or Sabbatarian, You shall desecrate the day you esteem as holy, and keep sacred to religion that we deem to be so.”
In the State of Ohio a Sunday law has been upheld, not on account of the holiness or sanctity of any particular day upon which cessation from secular employments may be required, but as a municipal or police regulation which it is competent for the Legislature to make. In that State they repudiate the doctrine that Christianity is a part of the common law of Ohio, but the Court conceded that Christianity is a part of the common law of England. Bloom v. Richards, 2 Oh. St., 387.
In Indiana a Sunday law has been held constitutional and valid. In Voglesong v. The State, 9 Ind., 112, the Court say: *162 “The constitutionality of the Sunday act we should not discuss; though the counsel in this case has presented a very learned argument against its validity. The question can hardly be considered as an open one. The grounds upon which such acts are sustained have been thoroughly examined, and are generally admitted to be substantial. This Court has acted upon them as such.” Reynolds v. Stevenson, 4 Ind., 619.
The same rule has been laid down in the very recent case of Kurtz v. The People, 33 Mich., 280.
The foregoing citation of authorities is sufficient to show very clearly and conclusively that Sunday laws have received the sanction and support of many of the highest Courts of the Union, and so far as my examination has gone, the current of authority upon the subject is almost undisturded by any conflicting decision.
Our Sunday law was passed on the tenth day of April, 1858. It was entitled “An act to provide for the better observance of the Sabbath,” and for all the purposes of the case now in hand may be considered substantially the same as the act now in force, the validity of which is attacked in this proceeding. Very soon after the passage of the act its constitutionality was assailed in the case of Ex parte Newman, 9 Cal., 502, and by a majority of three Judges at that time constituting the Supreme Court the act .was held unconstitutional. Field, Justice, dissented, how ever, and the decision in the Newman case was not permitted long to remain the law of the State. In the case of Ex parte Andrews, 18 Cal., 679, which was decided at the July term, 1861, the same question was presented to the Supreme Court, and the act of 1858 was declared constitutional by the concurrent opinions of all the Judges, The dissenting opinion of Mr.Justice Field in the case of Ex parte Newman was adopted, as fully and correctly defining the views of the Judges then constituting the Court. The question came before the Court again in Ex parte Bird, 19 Cal., 130, and the Sunday law was again declared constitutional and the Andrews case affirmed.
It will thus be seen that the departure from the line of authority was of short duration and that the highest Court of this State, at an early day in our history, returned to the well-beaten track of judicial authority on this interesting and frequently discussed question. It is too late now to indulge in another de *163 parture, even if I was inclined to set aside the great weight of judicial opinions by which Sunday laws have been sustained and enforced. But I feel no such inclination. My views are fully in accord with those expressed by other Judges, and regarding the matter from a purely secular standpoint, the law is a proper and salutary one. It imposes no restraint upon the conscience of any member of the community; it exacts from no person the performance of any religious rites or ceremonies; it prescribes no religious faith or belief; a man may be an Episcopalian, a Methodist, a Catholic, a Hebrew, or, if he sees fit, even an Infidel. He may worship one God, or a plurality of Gods. He may be a Trinitarian or a Unitarian, or he may reject all belief in the superintending care of a Divine Providence. Sunday laws leave his religious belief and practices as free as the air he breathes. It only forbids the carrying on of certain kinds of business on a certain day of the week, and the day selected in deference to the feelings and wishes of a large majority of the community is that day commonly denominated the Christian Sabbath or Sunday.
Henshaw and Brandon, for petitioner.
Attorney General Hart, for respondent.
I have examined the questions involved in this case at some length because they are important, and because there are many other cases similar in their nature, which may possibly be determined by the views herein expressed. My conclusion is, that there is nothing in the so-called “Sunday law” which in any manner interferes with the “free exercise and enjoyment of religious profession and worship” secured to all men by Section 4, Article I, of the Constitution.
Writ dismissed and petitioner remanded.

—Pacific Coast Law Journal.