# STATE EX REL. TEMPLE et al. v. BARNES, Sheriff.

(— L.R.A. (N.S.) —, 132 N. W. 215.)

**Habeas corpus — for irregularities at trial.**

1. Irregularities occurring at the trial, and errors of the trial court in its procedure in a criminal action, are not reviewable on habeas corpus.

**Habeas corpus — sufficiency of answer to petition.**

2. The petition of the relators alleges as one ground for their release that they tendered the sheriff, who held them in custody under a commitment from the police court of the city of Bismarck, the sum of $50 in payment of the fine imposed by such court. The sheriff's return, containing commitment and judgment, discloses that the fine was $50 each, and that no tender was made other than $50 to release both defendant petitioners. *Held*, that the return of the sheriff was a complete answer to the petition on that point.

**Sunday — constitutionality of statute — religious liberty.**

3. Section 4 of the Constitution of this state provides that "the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall be forever guaranteed in this state, and no person shall be rendered incompetent to be a witness or juror on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of this state." *Held*, that in general laws prohibiting the doing of certain acts and the performance of certain kinds of labor, upon the first day of the week, commonly called "Sunday," are not in violation of this provision, as they in no way work an establishment of a religion, provide for compulsory support, by taxation or otherwise, of religious institutions, make attendance upon religious worship compulsory, work a restriction upon the exercise of religion according to the dictates of conscience, or impose restrictions upon the expressions of religious belief.

**Statutes — as to Sunday theaters, etc. — special laws.**

4. Chapter 285, Laws 12th Leg. Assem., making it unlawful to keep open or run or permit to be run any theater, show, moving-picture show, or theatrical performance, upon the first day of the week, commonly called the Sabbath,

<hr>

Note.—The question of the constitutionality of Sunday laws is treated in notes in 22 L.R.A. 721, 3 Am. Rep. 372, and 82 Am. Dec. 121.

As to validity of classification in Sunday law, see notes in 14 L.R.A. (N.S.) 1259, and 32 L.R.A. (N.S.) 1190.

Keeping theater open on Sunday as violation of Sunday laws, see note in 17 L.R.A. (N.S.) 1157.

and prescribing penalties for violation thereof, is not special legislation, as, if the legislative interpretation of the former law was correct, and it did not include theatrical performances in its provisions, chapter 285, supra, is in the nature of an addition to former prohibitions of the statute, making it more general and more universal in its application than it was previous to the enactment of said chapter; and in any event, if said chapter stood alone, it would constitute a valid enactment.

Opinion filed June 6, 1911.

Application by the State, on relation of C. W. Temple and Clara Wright, for writ of habeas corpus to Frank Barnes, Sheriff of Burleigh County.

Writ quashed, and petitioner remanded to custody of the sheriff.

*Niles & Koffel,* for relators.

*W. L. Smith,* State's Attorney, opposed.

SPALDING, J. Chapter 285 of the Laws of the Twelfth Legislative Assembly of the State of North Dakota, introduced as House Bill No. 328, omitting title, reads as follows:—

"Sec. 1. Theaters open on Sunday unlawful.—It shall be unlawful to keep open, or to run, or permit the running of, any theater, show, moving-picture show, or theatrical performance, upon the first day of the week, commonly called the Sabbath.

"Sec. 2. Penalty.—Any person, firm, or corporation violating any of the provisions of this act shall, upon conviction thereof, be deemed guilty of a misdemeanor, and shall be punished by a fine of not less than $25 or more than $50.

"Sec. 3. Emergency.—Whereas, there is no express provision of law prohibiting the keeping open or running, or permitting the running of, any theater, show, moving-picture show, or theatrical performance, upon the first day of the week, commonly called the Sabbath, an emergency exists and this act shall take effect and be in force from and after its passage and approval."

It took effect March 3, 1911. On the 22d day of April, 1911, the relators were convicted in the police court of the city of Bismarck of violating the above law, and on the verdict rendered the police magistrate entered judgment against them, imposing a fine of $50 each,

and adjudging that, on failure to pay such fine, they each be imprisoned in the Burleigh county jail for a period of twenty-five days or until the fine be paid. Bail was fixed on appeal in the sum of $250. The specific charge was that of running a moving-picture show and theatrical performance upon Sunday, the 16th day of April, 1911, in said city of Bismarck. They refused to pay the fine imposed, and were duly committed to the county jail in accordance with the judgment. They subsequently applied to the judge of the sixth judicial district for a writ of habeas corpus, which was denied. The writ was issued by this court, and the sheriff directed to have the bodies of the said relators before this court on a date specified, "to do and receive what shall then and there be concerning the said C. W. Temple and Clara Wright." Upon the day specified the sheriff made return to the effect that he detained the petitioners in jail as sheriff and by virtue of a certain commitment issued to him out of the office of the police magistrate of the city, which commitment was set forth in his return and included a copy of the judgment. He also averred that neither of said petitioners had paid or offered to pay the fine of $50 so assessed against each of them, and that the period of twenty-five days, as commanded in the judgment and commitment, had not expired.

1. On the hearing a great number of reasons were assigned by the petitioners why they should be discharged from the custody of the sheriff. Most of such reasons relate solely to alleged irregularities occurring on the trial, or to errors of the trial court in its procedure, and are not reviewable on habeas corpus. State ex rel. Mears v. Barnes, 5 N. D. 350, 65 N. W. 688; State ex rel. Peterson v. Barnes, 3 N. D. 131, 54 N. W. 541.

2. It is alleged as a ground for the discharge of the petitioners that they tendered to the respondent sheriff the sum of $50 in release of the restraint imposed, and that the same was refused. This allegation is supported by the affidavit of counsel, which is to the effect that on behalf of the relators he tendered the sum of $50 to the sheriff in satisfaction of the fine and in payment of the release of the petitioners named, and in accordance with the commitment under which said sheriff holds said petitioners, and that said tender was refused on the ground that it was insufficient. A sufficient answer to this objection is

that the commitment as set out in the petition of the relators does not conform to the commitment under which the sheriff returns he was restraining them; that such commitment, in fact, recited that each of the relators was sentenced to pay a fine of $50. No claim is presented that any tender was made except of the sum of $50 for the release of both defendants, and this was insufficient to satisfy the judgment.

3. It is urged that the law in question conflicts with the state Constitution, § 4 of which provides: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall be forever guaranteed in this state, and no person shall be rendered incompetent to be a witness or juror on account of his opinion on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state." Whatever the effect of the provisions of the Penal Code with reference to abstaining from labor on the Sabbath or first day of the week may be, we have little doubt that they, as well as all such statutes, were enacted with the purpose of protecting that part of the public which consists of a large majority, in the exercise of their varying and different methods of religious worship, and in recognition of the sacredness of the Christian Sabbath. A number of the courts of the different states have passed upon this question, and have held that this is a Christian nation, and that laws enacted to prevent the desecration of the Sabbath are valid for that reason, notwithstanding constitutional provisions similar to § 4, supra, and others peculiar to different states. The courts of practically all other states have sustained such statutes as a legitimate exercise of the police power, intended to promote the welfare, morals, and sanitary condition of the people. Many of these courts appear to have avoided determining its relation to the question of religion. We do not deem it necessary to pass upon that question; but, in view of this being the first time the law has been questioned in this court, a brief reference to the history of legislation on the subject may not be inappropriate, and a similar reference to a few of the decisions of other jurisdictions will throw some light upon the general subject.

The early Christians substituted the first day of the week, or Sun-

day, for the Jewish Sabbath, or seventh day of the week, and it has
since been observed as a day of rest and worship in Christian lands,
and, we think, generally by civilized peoples. Legislation on the sub-
ject was first had in Rome, about A. D. 321, when Constantine the
Great commanded all judges and inhabitants of cities to rest on the
venerable day of the Sun. Under Theodosius II., 425, games and
theatrical exhibitions were prohibited, and about a century later all
labor was prohibited on that day. In England laws of this kind were
in force in the reign of Athelstan, 925 to 940 A. D. The statute of
29 Chas. II., passed in 1678, seems to have laid the foundation for
laws on the subject in England and in many states of this country. It
provided that no craftsman, artificer, workman, laborer, or other per-
son whatsoever should do or exercise any worldly labor, business, or
work of their ordinary callings upon the Lord's day, or any part there-
of (works of necessity and charity excepted), and placed prohibitions ·
upon public sales on the Lord's Day. Fairs were prohibited in the
reign of Henry VI. and amusements in the first year of Charles I. On
the immigration from England to America the act of 1678 was taken
as a model in most of the colonies, its terms, however, being varied
somewhat; but a Sunday law was enacted in each of the colonies, and
such a law is found in the statutes of every state in the Union. It has
been attacked in very nearly every state, and almost as often sustained.
Where not sustained, courts have based their decisions on some peculiar
or special feature not applicable here. Without quoting at great length
from authorities explaining and sustaining such statutes in some degree
or wholly from a religious standpoint, we mention Charleston v. Ben-
jamin, 2 Strobh. L. 508, 49 Am. Dec. 608; Lindenmuller v. People, 33
Barb. 548; Shover v. State, 10 Ark. 259; State v. Ambs, 20 Mo. 215;
2 Bl. Com. 63. Mr. Freeman, in his note, 49 Am. Dec. 617, says:
"In the earliest contested cases, the constitutionality of acts for the ob-
servance of the Lord's Day was defended on the ground of the assumed
right of a free Christian people, looking to the conservation of the pub-
lic order, peace, and morality, and the promotion, within well-guarded
limits, of the religious ideas immemorially pervading their history
and indelibility stamped upon the character of their laws and institu-
tions, to set apart the Lord's Day as a recurring period of ceremonial
rest and voluntary worship. That ground seems to have been abandoned

in later times, to a great extent, but it has never yet been conclusively settled that it was not well taken." Judge Story asserts that the Christian religion is the religion of liberty, and may well be regarded as the true basis of our popular form of government, and that at the adoption of the Constitution, and the amendment to it which provides that Congress shall pass no law respecting an establishment of religion or prohibiting the free exercise thereof, it was probably the universal sentiment in America that Christianity should receive the support of the state, so far as was consistent with the general freedom of conscience and religious worship. The real object of the amendment respecting religion was to prevent the establishment of a hierarchy which would control the exclusive patronage of the government; and it may well be conceived that a proper recognition of the prevailing faith, supported by no compulsory acceptance of its doctrines or attendance upon its rites, would still be within constitutional limits, as the amendment to the Federal Constitution embodies the idea embraced in the Constitutions of the states. Story, Const. §§ 1873, 1874, 1877.

In New York and some other states it has been held that Christianity is a part of the common law of the state, and entitled to recognition and protection by the temporal courts. People v. Ruggles, 8 Johns. 291, 5 Am. Dec. 335; Vidal v. Philadelphia, 2 How. 198, 11 L. ed. 234; Shover v. State, 10 Ark. 259; Sedgw. Stat. & Const. Law, 14. Judge Cooley was of the opinion that, while the religious freedom of the people is protected and defended by the American Constitution, there is no prohibition against the solemn recognition by the authorities of a superintending Providence in public transactions and exercises; and no principle of constitutional law is violated when Thanksgiving Day or fast days are appointed, when chaplains are designated for the Army and Navy, and legislative sessions are opened with prayer, or by the general exemption of houses of religious worship from taxation. In State v. Ambs, 20 Mo. 215, the court said: "We must regard the character and condition of the people for whom our organic law was made. It appears to have been made by Christian men, and shows on its face that the Christian religion was the religion of its framers. The convention that adopted it sat under a Sunday law, adjourning in obedience to it, and in the conclusion of the instrument it is solemnly affirmed by its authors that their signatures were attached thereto

A. D. 1820, a form adopted by all Christian nations in solemn public acts." And Lindenmuller v. People, 33 Barb. 548, was a case sustaining a conviction for the violation of a city ordinance prohibiting theatrical performances on Sunday, and holding it valid on the ground that Christianity was the basis of our free institutions, the conservator of the peace, order, morality, and social welfare of the commonwealth, and that the compulsory observance of the Lord's Day was not only compatible with the constitutional provisions prohibiting the enactment of any law interfering with religion or restricting the free exercise thereof, but conducive to every need of good government; that the act was passed in deference to a prevailing sentiment that could not be ignored; and that, as no religious test was set up and no religious rite or ceremony exacted, it was well within the restrictions of the state Constitution. Lindenmuller v. People was approved in Neuendorff v. Duryea, 69 N. Y. 557, 25 Am. Rep. 235; People v. Moses, 140 N. Y. 214, 35 N. E. 499, and in People v. Havnor, 149 N. Y. 195, 31 L.R.A. 689, 52 Am. St. Rep. 707, 43 N. E. 541, and perhaps in later cases, by the New York courts, and is a leading case on the subject.

It is in the light of these considerations that such laws must be construed. Chapter 4 of the Penal Code of this state (Rev. Codes 1905, §§ 8559–8584) is the first chapter of that Code in the order of chapters classifying crimes, and is entitled, "Crimes against Religion and Conscience," and includes definitions of the crimes of blasphemy, profane swearing, obscene language, and Sabbath breaking. If we may judge of the sentiments of the legislature enacting our Penal Code by the order of precedence given the different classes of offenses treated therein, it would seem that they considered this among the most important. They began with crimes against religion and conscience, and followed in the order named with crimes against the elective franchise, against the executive power of the state, against the legislative power, against public justice, etc. Our Penal Code was enacted by the territorial legislature on the 11th day of January, 1865, and the title of this chapter has remained unchanged and no material alterations have been made in its text. When our Constitution was adopted in 1889, article 4, supra, was taken literally from the Constitution of California of 1879, and Ex parte Burke, 59 Cal. 6, 43 Am. Rep. 231, shows the construction of the highest court of California of its provisions prior to its adoption in-

to our Constitution. It sustains the validity of a law of that state punishing the transaction of business upon Sunday. In the opinion in that case previous decisions of that court were reviewed and commented upon by the learned chief justice. He also reviewed, at considerable length, other authorities. See also Ex parte Koser, 60 Cal. 177. The first Constitution of the state of New York, adopted in 1777, contained the following provision: "38. And whereas, we are required. by the benevolent principles of rational liberty, not only to expel civil tyranny, but also to guard against that spiritual oppression and intolerance wherewith the bigotry and ambition of weak and wicked priests and princes have scourged mankind, this convention doth further, in the name and by the authority of the good people of this state, ordain, determine, and declare that *the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed, within this state, to all mankind; provided that the liberty of conscience hereby granted shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state."* And the Constitution of 1821 of New York (§ 3, art. 7) reads: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state." This section was copied literally in § 3 of article 1 of the Constitution of 1846 of New York, except that there was interpolated the provision now found in the Constitution of this state, that no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief. It thus appears that in all material respects California adopted its provisions regarding religion from New York, in which state, by a long line of authorities, only a few of which are cited in this opinion, laws prohibiting labor, amusements, etc., have been sustained, both on religious grounds and as being within the police power of the state. While, as we have said, we have no doubt that the intent of the framers of the different Constitutions and laws was to protect Sunday as a sacred day, set apart for religious observance and rest, yet for the purposes of this case it is immaterial what their purpose was. If the provisions are clear, we need

not consider the motives which prompted the lawmakers, and they are clear. The law here in question in no manner interferes with the religious convictions or scruples of any inhabitant of the state. It neither prescribes for, nor compels, the petitioners or others to observe any form of religious worship. It creates no establishment of religion. The wills and consciences of all the people are left free in this respect. In the language of Chancellor Kent, "the constitutional provision is fully satisfied by a free and universal toleration." People are at liberty to attend the church of their choice or to continuously remain away from church. They are not required by it to contribute by taxation or otherwise to the maintenance of any form of religious practice or worship. They are at liberty to ignore, so far as their individual conduct is affected by the statute, the existence of churches and of religion. The legislative assembly has, however, said that in doing so they must not interfere with the purpose of the day, as viewed in the light of the history of the times, when out Constitution was framed, and the purpose of the founders. In fact, it may be maintained that the only effect of Sunday laws like our own is to secure peace and quiet in the observance of the religious ceremonies and worship of an overwhelming majority of our people. The fact that they happen to be adherents of the Christian faith may in no manner affect the principle. The legislature has reached the conclusion that the performance of ordinary labor and of certain other acts is an infringement upon the right of a great majority of the people to worship and to observe the day as set apart for that purpose, and as a day of rest. It is not for the courts to split hairs in an attempt to determine whether the judgment of the legislature has been exercised to the last degree of refinement so as to include nothing which may in any manner relate to such rights. In the exercise of the police power, the question as to what provisions are needful or appropriate is primarily for the legislature to determine, and, when it does not appear clearly that a statute thought to be within that power has no real or substantial relation thereto and to the rights of the citizen, the judgment of the legislative assembly is conclusive. The preamble to the Constitution recites that "the people of North Dakota, grateful to Almighty God for the blessings of civil and religious liberty, do ordain and establish this Constitution." Elsewhere, Sunday is expressly recognized by excluding it from the time required

for the return of bills by the governor during the sessions of the legislature. Const. § 79. Officers are required to take an oath on entering upon the performance of the duties of their office; the same requirement is made of witnesses before testifying, with certain exceptions. The Constitution is witnessed by the signature of the President and Secretary, as well as the members of the convention which framed it, "in the year of our Lord, 1889." All these things show that the character of our institutions was recognized by the delegates who framed the Constitution, and by the people who voted for its adoption, so when we find it provided, in the same section that guarantees the free exercise and enjoyment of religious profession and worship, that the legislature may enact laws to prevent practices inconsistent with the peace or safety of this state, we have a very strong intimation that the supreme authority regards laws of the nature of the one complained of as necessary to secure the peace and safety of the state, and, if so, unless clearly without relation to that subject, they are valid. It also seems almost incredible that the power of the legislature to enact such laws should be questioned at this day, when the tendency throughout the American nation is towards a more general observance of all laws protecting people in the observance of the first day of the week. It is plain to us that this statute, if invalid, must accomplish one of five things: First, it must work an establishment of a religion; second, provide for compulsory support, by taxation or otherwise, of religious instruction; third, make attendance upon religious worship compulsory; fourth, work a restriction upon the exercise of religion according to the dictates of conscience; or, fifth, impose restrictions upon the expression of religious belief. The statute complained of does neither of these things, and therefore, as against the objection which we have considered, it is valid. Such laws have been so universally sustained that we cite only a few of the authorities bearing on the subject in addition to those to which reference has already been made. Charleston v. Benjamin, 2 Strobh. L. 508, 49 Am. Dec. 608; Specht v. Com. 8 Pa. 312, 49 Am. Dec. 518; Allen v. Deming, 14 N. H. 133, 40 Am. Dec. 179; Shover v. State, 10 Ark. 259; Tucker v. West, 29 Ark. 386; Hennington v. State, 90 Ga. 396, 4 Inters. Com. Rep. 413, 17 S. E. 1009; Story v. Elliot, 8 Cow. 27, 18 Am. Dec. 423; People v. Moses, 140 N. Y. 214, 35 N. E. 499; Com. v. Dextra, 143 Mass. 28, 8 N. E. 756;

State v. Ambs, 20 Mo. 215; St. Joseph v. Elliott, 47 Mo. App. 418; Liberman v. State, 26 Neb. 464, 18 Am. St. Rep. 791, 42 N. W. 419; People v. Bellet, 99 Mich. 151, 22 L.R.A. 696, 41 Am. St. Rep. 589, 57 N. W. 1094; State v. Sopher, 25 Utah, 318, 60 L.R.A. 468, 95 Am. St. Rep. 845, 71 Pac. 482; note, in 12 Ann. Cas. 1096; State v. Dolan, 13 Idaho, 693, 14 L.R.A.(N.S.) 1259, 92 Pac. 995; State v. Petit, 74 Minn. 376, 77 N. W. 225; Petit v. Minnesota, 177 U. S. 164, 44 L. ed. 716, 20 Sup. Ct. Rep. 666; Topeka v. Crawford, 78 Kan. 583, 17 L.R.A.(N.S.) 1156, 96 Pac. 862, 16 Ann. Cas. 403.

4. It is urged that even though Sunday laws may, as a general proposition, be found unobnoxious to the provision of the Constitution to which reference has been made, and that if the act complained of were a part of the general Sunday law, and as such constitutional, that, having been passed as a separate and independent measure, it is in contravention of the terms of §§ 11 and 20 of the Constitution; in other words, that it is special legislation. We need not take the trouble to define special legislation, nor to determine whether this might not be such if it were the only law on the subject. The only answer necessary to be made to this contention is that, as evidenced by the terms of the emergency clause attached to this law, the legislative assembly considered the general Sunday law as not prohibiting the maintaining and running of theaters and similar shows on Sunday, and that until the enactment of this statute it was legal to maintain such shows upon that day. Without determining whether the legislative interpretation of the old law was correct, but assuming it to be so, it is quite evident that, instead of this being a special law, it is in the nature of an addition to the old statute on the subject, making it more general in its terms and more universal in its application than it was before the new enactment took effect. It enlarges the scope and application of the statute by enumerating theaters and shows among the prohibited avocations, and is not subject to the objection made. However, if it did stand alone, the books are replete with authorities passing upon the constitutionality of similar statutes, and almost without exception holding them valid as against these identical, and similar, objections. Ex parte Koser, 60 Cal. 177; Ex parte Donnellan, 49 Wash. 460, 95 Pac. 1085; State v. Dolan, 13 Idaho, 693, 14 L.R.A.(N.S.) 1259, 92 Pac. 995; State v. Sopher, 25 Utah, 318, 60 L.R.A. 468, 95 Am. St.

Rep. 845, 71 Pac. 482; Bohl v. State, 3 Tex. App. 683; St. Louis v. De Lassus, 205 Mo. 578, 104 S. W. 12; People ex rel. Woodin v. Hagan, 36 Misc. 349, 73 N. Y. Supp. 564; Liberman v. State, 26 Neb. 464, 18 Am. St. Rep. 791, 42 N. W. 419; People v. Bellet, 99 Mich. 151, 22 L.R.A. 696, 41 Am. St. Rep. 589, 57 N. W. 1094; People v. Havnor, 149 N. Y. 195, 31 L.R.A. 689, 52 Am. St. Rep. 707, 43 N. E. 541; Petit v. Minnesota, 177 U. S. 164, 44 L. ed. 716, 20 Sup. Ct. Rep. 666; State v. Petit, 74 Minn. 376, 77 N. W. 225; State ex rel. Hoffman v. Justus, 91 Minn. 447, 64 L.R.A. 510, 103 Am. St. Rep. 521, 98 N. W. 325, and note to same case, 1 Ann. Cas. 93; State v. Weiss, 97 Minn. 127, 105 N. W. 1127, 7 Ann. Cas. 932; State v. Bergfeldt, 41 Wash. 234, 83 Pac. 177, 6 Ann. Cas. 979.

The statute in question is not vulnerable to the attacks made upon it, and we hold that its terms bring it within the proper exercise of the legislative power. The writ heretofore allowed is quashed. The petitioners are remanded to the custody of the sheriff, with directions that on payment of the fines imposed, or, in lieu thereof, imprisonment as adjudged, they be discharged.

MORGAN, Ch. J., not participating. Honorable W. J. KNEESHAW, Judge of the Seventh Judicial District, sat by request.