**EAST COAST LUMBER TERMINAL, Inc. v. TOWN OF BABYLON.**

No. 208, Docket 21279.

United States Court of Appeals
Second Circuit.

April 5, 1949.

Jacob W. Friedman and Daniel A. Shirk, both of New York City, for plaintiff.

Oscar Murov, of Lindenhurst, N. Y., and Joseph H. Wackerman, of Brooklyn, N. Y. (Lindsay R. Henry, of Bay Shore, N. Y., of counsel), for defendant.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The plaintiff is the owner of about eighty acres of land in the Town of Babylon, containing sand and gravel, which it excavates and sells. It seeks to enjoin the town, pendente lite, from enforcing against it an ordinance, a copy of which we annex in the margin.* Its complaint is that the

---

* Section 1. No excavation for purposes other than the construction of a wall, building or part thereof, farming or public use, shall be commenced except in conformity with the provisions of this Ordinance.

Section 2. Before the excavation or removal of any nonvegetative earth products other than for the construction of a wall, building or part thereof, farming or public use, the owner or lessee of the premises, or his agent, shall obtain a per-

ordinance is unconstitutional under the Fourteenth Amendment, because it deprives the plaintiff of its property without due process of law, and that the defendant has

mit therefor from the Town of Babylon for such excavation and removal.

Section 3. The official designated by the Town Board to issue such permits shall charge for said permits a minimum fee of $10.00 for an area not exceeding 5,000 square feet. For area exceeding 5,000 square feet, the minimum fee shall be $25.00 plus $1.00 for each additional 1,000 square feet or fraction thereof exceeding 5,000 square feet.

Section 4. Application for such permit shall be made on forms supplied by the Town of Babylon and shall be accompanied by (1) a plot plan drawn to scale, showing the location and dimensions of the affected property together with any and all buildings or structures located thereon; and (2) a cross section of the property, prepared by a duly licensed engineer of the State of New York, showing elevations at intervals of 25 to 50 feet, depending upon the size of the premises, as set forth in rules and regulations to be adopted by the Town Board of the Town of Babylon.

Section 5. Such permits shall expire by limitation 30 days from the date of issuance unless extended by the Town Board.

Section 6. Before the issuance of a permit, the owner or applicant shall execute and file with the Town Clerk a surety company bond, the amount of which shall be fixed by the Town Board but no case to be less than $2,000.00, said bond to be approved by said Board as to form, sufficiency and manner of execution. Said bond shall be conditional for the faithful performance of the conditions contained in this Ordinance, the observance of all other municipal ordinances, and shall indemnify the Town of Babylon and the Superintendent of Highways for any damage to Town property. Said bonds shall remain in force and effect until a certificate of completion has been issued by the Town of Babylon, certifying to the fact that all provisions of the Ordinance and conditions of the permit have been carried out to a satisfactory conclusion. Application for such certificate shall be made by the owner, lessee or his agent upon forms provided by the Town of Babylon and shall be accompanied by a cross-section of the affected property prepared by a duly licensed engineer of the State of New York, after completion of the operations with elevations at intervals of 25 to 50 feet, depending upon the size of the premises, as set forth in rules and regulations to be adopted

by the Town Board of the Town of Babylon.

Section 7. Removal of Top Soil. In excavating for the removal of top soil only, a minimum of four inches of top soil shall remain undisturbed upon the affected premises. No such excavation shall be made within 10 feet of any property line. Adequate barricades shall be erected and maintained and adequate provisions made for the prevention of flying dust, pursuant to the rules and regulations to be adopted by the Town Board of the Town of Babylon.

Section 8. Removal of Other Non-vegetative Earth Products. No excavation for the removal of non-vegetative earth products, except as stated in Section 7, shall be made within 20 feet of any property line. Adequate barriers consisting of a chain link wire fence, 6 feet in height, shall be erected and maintained, surrounding the affected property, with no openings except necessary gates for ingress and egress. A similar type of fencing giving the proper protection may be erected and maintained upon the approval of the Town Board. Adequate provision shall be made for the prevention of flying dust by the spreading of dust-down or its equivalent, pursuant to the rules and regulations to be adopted by the Town Board of the Town of Babylon. Upon completion of operations under the terms of the permit as issued, the excavated area shall be refilled with clean, non-burnable material containing no garbage, refuse, offal or other unwholesome matter. The affected area shall be graded to the level of the abutting highway, surfaced with a minimum of four inches of top-soil and seeded to insure fast-growing vegetation.

Section 9. Nothing herein contained shall require a person to obtain a permit, or prevent him from removing topsoil from one part to another part of the same premises when such removal is necessary as an accessory use or is made for the purpose of improving said property.

Section 10. Violations. Every violation of the provisions of this Ordinance shall be punishable by a fine not to exceed $100.00 or by imprisonment for not more than three months or by both such fine and imprisonment.

Section 11. If any provision of this Ordinance is held invalid, the remainder of the Ordinance shall not be affected thereby. This ordinance shall take effect immediately.

applied it with unconstitutional discrimination. Judge Galston's opinion[1] states the facts; and in what we say we shall assume an acquaintance with it. He refused to enjoin the defendant, pendente lite, or to pass upon the constitutionality of the ordinance, until the rights of the parties, so far as they depended upon the law of New York, had been decided by an appellate division, or by the Court of Appeals. The plaintiff is a New York corporation, and there is no diversity of citizenship between the parties; hence the jurisdiction of the district court stands upon whether the "matter in controversy * * * arises under the Constitution * * * of the United States."[2] We think that Galston, J., did not intend to hold that he had no jurisdiction—in spite of some of his language—for otherwise he would not have retained the complaint for future action, but would have dismissed it. We read what he said to mean that, although in this case he had jurisdiction, stricti juris, to dispose of all the questions involved, he should, as matter of discretion, remit state issues to state courts for their decision, and suspend his decision as to any federal issues until they acted. With this we agree.

The Fourteenth Amendment is directed against the action of states; and a state can act only through human agents, who, even though they are its officials, may of course exceed their authority upon occasion. If they do, they will not be able to justify under the state law, and ordinarily anyone injured by them will have a remedy. When that remedy is adequate, as it is in New York, the injured party need not invoke the Amendment. Indeed, there is no basis for doing so, because by hypothesis the official's action has not been the action of the state. An illustration of the application of this principle is in the case of direct appeals from judgments of the highest court of a state. The Supreme Court has often refused to entertain such appeals, until it appears, not only that the state court has not decided the case under state law, but that the judgment could not have been arrived at under that law.[3] In actions originally brought in the district courts it is obviously not possible to proceed in this way. The choice lies between deciding the state issues along with the federal ones; retaining the federal issues undecided until a state court has decided the state issues; and dismissing the action, a course which would deny the whole jurisdiction.[4] There is indeed no insuperable obstacle to the district court's deciding the state issues; and at times that is still permissible in this kind of action. However, there are usually good reasons for not doing so, because the federal court must then decide whether state officials have kept within the limits of their authority; and it is, and should be, an unwelcome duty for an alien tribunal to assume such a function. It is an inquiry full of possibilities of friction and discord.

In Barney v. City of New York,[5] the court affirmed a dismissal of the complaint for lack of jurisdiction. It appears from the opinion of Lacombe, J., in the companion case,[6] that he had reached the same decision because he found that the state law did not justify the acts of the state officials complained of. Obviously, the court thought it proper to decide that issue, though it resulted in no more than a conclusion that the district court was without jurisdiction. One can only wonder whether such a judgment would have been a bar to a later action in the state court against the officials. Raymond v. Chicago Union Traction Company[7] apparently took the opposite view; at least, the court seems to have assumed that discriminatory assessments of state officers were acts of the state, whether or not they were corrigible under the law, and that they presented a case for federal intervention. At any rate,

---

[1] 81 F.Supp. 701.

[2] § 1331, Title 28 U.S.C.A.

[3] Lynch v. People of New York ex rel. Pierson, 293 U.S. 52, 55 S.Ct. 16, 79 L. Ed. 191; Honeyman v. Hanan, 300 U.S. 14, 57 S.Ct. 350, 81 L.Ed. 476; City of New York v. Central Savings Bank, 306 U.S. 661, 59 S.Ct. 790, 83 L.Ed. 1058; Minnesota v. National Tea Co., 309 U.S. 551, 60 S.Ct. 676, 84 L.Ed. 920.

[4] § 1331, Title 28 U.S.C.A.

[5] 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737.

[6] Huntington v. City of New York, C.C., 118 F. 683.

[7] 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann.Cas. 757.

in Home Telephone and Telegraph Company v. City of Los Angeles,[8] in which the whole question was reviewed at length, it was definitively decided that, when a state official assumed to be acting within his authority, the district court was free to disregard all questions of state law, and proceed at once to decide whether the acts challenged violated the Amendment. As we have already said, there appear still to be occasions when this is permissible; at least it is difficult to conclude otherwise from two decisions which have never been overruled.[9] On the other hand, in Greene v. Louisville & Interurban Railroad Company [10] the court decided the issue of state constitutional law in the plaintiff's favor and refused to consider the federal issue at all; yet, instead of dismissing the bill, as it had done in Barney v. City of New York, supra, it affirmed the decree. The mere allegation of a federal question apparently gave the district court jurisdiction to pass a judgment on the merits upon a question of state law, just as though the suit had depended only upon diverse citizenship. It must be owned, with deference, that the upshot of the decisions so far was confusing.

The court, for the first time so far as we have found, refused in Gilchrist v. Interborough Rapid Transit Co.[11] to decide the state issues, which were, however, already in course of adjudication in the state courts. This was followed by Glenn v. Field Packing Co.[12] and Lee v. Bickell,[13] in which, though the court did indeed pass upon the state issues, it did so only tentatively; for the decree provided that if the state courts should later take a different view, either party might move to reopen and request a decision in accordance with the new ruling. So matters stood when the court decided Railroad Commission of Texas v. Pullman Co.,[14] in which it refused to pass upon state issues at all, and held open any decision upon the Amendment until the state court had decided them in an action to be brought. This practice has since then become common in this class of litigation,[15] and in the last of these decisions Reed, J., stated the doctrine in the following language, which we accept as authoritative: "where equitable interference with state and territorial acts is sought in federal courts, judicial consideration of acts of importance primarily to the people of a state or territory should, as a matter of discretion, be left by the federal courts to the courts of the legislating authority unless exceptional circumstances command a different course." We conclude, therefore, that the "course" adopted by Galston, J., was right, unless we can find "exceptional circumstances" which "command" a different one. Not only do we find none; but we think that the following considerations made that "course" inevitable.

Concededly, the ordinance did not actually take the property. It merely imposed conditions upon the excavation of "non-vegetative earth products," which the plaintiff says were so onerous as to deprive the land of its principal value. We recognize that there may be conditions so burdensome that they constitute even an outright "taking," although the title to the property and some vestiges of its uses, remain in the owner.[16] Furthermore, if a state imposes "unreasonable" conditions upon its use which do not go so far as to be an out and out "taking," that too will be

[8] 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510.

[9] Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 434, 46 S.Ct. 331, 70 L.Ed. 664; Sterling v. Constantin, 287 U.S. 378, 393, 53 S.Ct. 190, 77 L.Ed. 375.

[10] 244 U.S. 499, 37 S.Ct. 673, 61 L. Ed. 1280, Ann.Cas.1917E, 88.

[11] 279 U.S. 159, 49 S.Ct. 282, 73 L.Ed. 652.

[12] 290 U.S. 177, 54 S.Ct. 138, 78 L. Ed. 252.

[13] 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337.

[14] 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971.

[15] City of Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; Spector Motor Service v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873; Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 69 S.Ct. 606, 615.

[16] Pumpelly v. Green Bay and Mississippi Canal Company, 13 Wall. 166, 20 L.Ed. 557.

unconstitutional.[17] Yet there is no royal road to decide what conditions are "reasonable," and nothing has provoked more discord in the books. It is not surprising that this should be so, for a court does not balance the conflicting interests at stake and substitute its own solution in place of the statute or the regulation. Its decision must be at one reserve: it may only say whether the measure under review was within the zone of possible solutions which "reasonable" persons might think "reasonable." In the pursuit of this elusive artifact in the case at bar the state courts may well hold that the New York Constitution [18] prescribes a more restricted zone than does the Amendment; and if they do, they will be free to hold the ordinance at bar unconstitutional, regardless of the Amendment, which is only a limitation. If the reverse proves true: that is, if they conceive that their constitution concedes a wider zone than does the Amendment, they will of course be obliged to yield, for the Amendment is law for them; but no one can tell in advance how they will decide. Thus it is doubly desirable to suspend any decision in the case at bar until the state courts have acted: it avoids the difficult duty of deciding how they would construe their own constitution on a point especially controversial, and it accords with the accepted rubric that a federal court will not undertake to interpret the federal constitution while it is possible to decide the case upon other grounds.

Moreover, there are also other reasons which made it desirable for Galston, J., to take the course which he did. The meaning of the ordinance is not plain as to the conditions of which the plaintiff complains, and such uncertainties are often treated as controlling in applying this doctrine.[19] These conditions are three: (1) the requirement that an excavator must renew his permit monthly; (2) the prohibitive size and conditions of the surety bond required; (3) the requirement that all excavation shall be refilled and covered with four inches of "top-soil." Section five of the ordinance provides

that permits shall "expire" after thirty days "unless extended by the Town Board"; but the implementing regulation declares as the only limitation upon the board's approval that the existing bond be extended. It is therefore at least open to doubt whether more can be demanded; conceivably the board has no power to exact a second fee, and it is not wholly without significance that it had never demanded more than one fee up to the time of the trial. Next, as to the size and conditions of the bond. Section six of the ordinance merely provides that the board shall fix its amount, that it shall not be less than $2,000, and that it shall be conditioned upon "faithful performance of the conditions" of the ordinance. The regulation adds that a bond for $2,000 shall be posted for "areas of 10,000 square feet or less," which for greater areas "shall be increased at the rate of $500 for each additional 10,000 square feet or part thereof." The plaintiff's eighty acres at these figures would require a bond of over $175,000; and, moreover, it has been unable to persuade its surety to continue even a much smaller bond. Nevertheless, it is not excavating all its tract at the one time; and the regulation may not require an owner to do more than provide a bond which shall progressively cover those acres which he has excavated and has not yet refilled. The ordinance demands interpretation before either a state court or the district court would be in a position to decide whether these two conditions are "unreasonable" even under the New York Constitution.

Coming then to the third condition, § 8 provides that when "non-vegetative earth," such as the plaintiff's sand and gravel, is removed, "the affected area shall be graded to the level of the abutting highway, surfaced with a minimum of four inches of top-soil and seeded to insure fast-growing vegetation." The plaintiff reads this to mean that, even when there is no existing "top-soil" upon the area to be excavated, the ordinance requires four inches to be

---

[17] Liggett Co. v. Baldridge, 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204; New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747.

[18] § 6, Article 1.
[19] Toomer v. Witsell, 334 U.S. 385, 392, note 15, 68 S.Ct. 1156.

112

added after the excavation is completed. Perhaps the state courts will so construe the language, but it is at least debatable whether this provision was intended to apply to areas where there was no original "top-soil"; or at least to areas whose surface the owner has restored substantially to its original condition. It was not for the district court to say how literally the ordinance should be read, or how far it may be limited by its purpose. Furthermore, § 11 provides that, if any of the provisions in the ordinance proves invalid, the others shall stand; so that, even though the state courts should hold that the requirement as to "top-soil" is "unreasonable," if applied to those acres where there was none originally, they may well limit any injunction to the enforcement of that condition alone, adopting the relief to the necessities of the occasion, as they see it. Such questions are primarily for those courts.

■ Finally, since the issue is one of discretion, the district judge's decision may be entitled to that presumptive immunity from review which all discretionary decisions enjoy. We read his order, as adopting the procedure laid down by the Supreme Court in Spector Motor Service v. McLaughlin, supra;[20] and this was proper, because in New York,[21] as in Connecticut, it is possible for the plaintiff to obtain a declaratory judgment limited to state issues; thereafter the district court can dispose of any federal issues that may remain. Indeed, there is already a pending criminal proceeding.

■ There remains the question whether, although the defendant is enforcing the ordinance against the plaintiff alone, it has exempted from its operation others who were equally within its terms. It has indeed been the law for over sixty years[22] that the Amendment covers the unequal enforcement of valid laws, as well as any enforcement of invalid laws; but the question is really no different from that we have already considered. If the state affords an adequate remedy against unjust application of its laws by its officials, any-

one aggrieved by their acts must exhaust the remedy so provided before he may invoke the Amendment. The New York Town Law, McK.Consol.Laws, c. 62, § 137, provides the remedy of certiorari for the refusal of a town board to issue a license; and the plaintiff should show that that remedy does not apply to its permit under the ordinance. It is true that Galston, J., made some findings upon the issue, but in the view which we take it is unnecessary to pass upon them, beyond holding that they will not constitute a bar to any proceeding the plaintiff may take in the state court under the Town Law, or any other proceeding which it may think appropriate. We read them as intended to serve only as support for the denial of any injunction, pendente lite.

Order affirmed.

---

[20] 323 U.S. 101, 105, 106, 65 S.Ct. 152, 89 L.Ed. 101.

[21] § 473, Civil Practice Act.

[22] Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.