**The STATE of North Dakota, Respondent,**

**v.**

**GAMBLE SKOGMO, INC., a. k. a. Tempo Stores Corporation, Defendant and Appellant.**

**No. Cr. 339.**

Supreme Court of North Dakota.

Aug. 16, 1966.

Bosard, McCutcheon & Coyne, Minot, for appellant.

Richard B. Thomas, State's Atty., Minot, for respondent.

ERICKSTAD, Judge.

In this case the defendant, Gamble Skogmo, Inc., also known as Tempo Stores Corporation, was charged with the offense of Sabbath breaking under §§ 12–02–04, 12–21–15, and 12–21–16, N.D.C.C. Trial was before the County Judge with Increased Jurisdiction of Ward County, the defendant having waived a jury.

As the defendant is commonly known and advertises as Tempo, we shall hereafter refer to it by that name.

The essential facts are not in dispute. In the December 4, 1965, issue of the Minot Daily News, Tempo placed a large advertisement encompassing approximately two-thirds of page 3, informing the public that it would be open on Sunday, December 5, from 1:00 to 6:00 p. m. It announced special sales for Sunday, December 5, on toothpaste, items of clothing, motor oil, overshoes, soft drinks, toys, candy, battery booster cables, hair spray, sheet blankets, and sugar in five-pound bags. Part of the advertisement read as follows: "SUNDAY attend the church of your choice in the morning. Bring the family to Tempo in the afternoon. [The word *SUNDAY* was in lettering 2¾ inches high and extended across the width of the page.]

"We have extended our shopping hours from 72 per week to 77 for your shopping convenience. We will be open Sunday from 1 to 6 p. m. Bring the family and shop now for your holiday needs. We offer you, the shopper, gift wrapping service, travelers checks, money orders, gift certificates, notary public service and you can pay all your utility bills at Tempo. Our display floor is stocked with over 27,000 items to choose from. No money needed, just say 'charge it'."

On Sunday, December 5, pursuant to its advertisement, Tempo opened its doors to the public and, with all of its many items exposed for sale, it was engaged in the sale of whatever items of merchandise its customers desired to purchase when officials of the sheriff's office arrested two of its clerks after they sold two electric extension cords to a customer then present.

It is clear from the evidence that Tempo (a large discount store) was open on Sunday for the general sale of merchandise and that the specific sale for which it was charged was within the authority of its clerks, pursuant to direction from its management.

At the close of the trial Tempo moved that the charges be dismissed on the ground that the testimony and evidence adduced by the State did not show the commission of a public offense for the reason that §§ 12–21–15 and 12–21–16, N.D.C.C., upon which the charges were based, violate Article I, Article V, and § 1 of Article XIV of the Amendments to the United States Constitution and §§ 4 and 20 of the North Dakota Constitution. This motion was resisted by the State's Attorney of Ward County and was denied by the court.

Tempo was thereafter found guilty of Sabbath breaking and was sentenced to pay a $50.00 fine and $200.00 costs. The appeal is from the judgment of conviction and sentence imposed.

We shall consider the arguments of Tempo in the order in which they have been stated in its brief. The first argument is in two parts:

The first part is that § 12–21–15, N.D.C.C., violates Article XIV of the Amendments to the United States Constitution and § 20 of the North Dakota Constitution as a law depriving Tempo of its liberty and property without due process of law and denying it the equal protection of the laws.

The second part is that the enforcement of § 12–21–15 lacks any semblance of consistency or justice and thus is a denial of equal protection.

The following quotation from Tempo's brief discloses its reasoning:

What reason can lie behind a law which permits the sale of fruit but not of vegetables? Why should the operation of a bootblack's stand be deemed a work of necessity and permitted on Sunday, and the sale of a loaf of bread prohibited? Why should the sale of cigarettes be permitted and the sale of a birthday present or a Christmas toy prohibited? How can the operation of automobile garages and filling stations be deemed works of necessity and permitted on Sunday, and "mechanical employments" prohibited? Why should a governmental agency, the Ward County Fair Association, be permitted to operate a carnival on Sunday when Section 12–21–15 N.D.C.C. makes it a crime for individual citizens to do so? See Hadler v. Northwest Agricultural, Livestock and Fair Ass'n, (ND 1931) [61 N. D. 647] 239 NW 736, to the effect that the Ward County Fair Association is a governmental agency.

Why should the Ward County Fair Association be permitted to collect rent on a percentage basis from an organization which conducts automobile races at the race track at the State Fair Grounds on Sunday, while Section 12–21–15 N.D.C.C. appears to prohibit automobile racing on Sunday? Why should this governmental agency supported in part by taxation be permitted to do with impunity what individuals are prohibited from doing? The test cannot be that of importance to the community for it can hardly be said that it is more important to be able to buy cigarettes than to be able to buy a loaf of bread. The test cannot be that of disturbance of the rest and repose of the community, for retail selling such as was engaged in by the defendant certainly does not•disturb the neighborhood's rest and repose more than the stock car races from which the Ward County Fair Association, supported in part by taxes, derives revenue. If the sale of milk, ice cream and soda fountain dispensations,

fruits, candy and confectionery is permitted all day, why should the sale of meats and fish be prohibited after 10:00 A.M.? What reason can exist for prohibiting the sale of a bottle of soda pop in a bowling alley on Sunday?

Not only is Section 12–21–15 devoid of any rational plan, but its enforcement likewise lacks any semblance of consistency or justice. The Ward County Sheriff testified that Section 12–21–15 is enforced fitfully with long periods of acquiescence in violation of the law. When enforced at all, the enforcement is arbitrary and discriminatory. For example, servile labor, except work of necessity and charity, is prohibited. The statute does not exempt radio or television broadcasting, which can hardly be construed to be work of necessity or charity. Yet each Sunday these commercial entertainment media enjoy full operation entirely free from prosecution. Indeed it would generally be conceded to be nothing short of ridiculous to attempt to prosecute the operators of radio and television stations; and yet the operation of these businesses on Sunday is prohibited by our statute. Section 12–21–15 N.D.C.C. is probably the most · frequently violated and least often enforced criminal statute on the books. Consistent enforcement would completely alter the social and economic habits of our state. It would, for instance, put an end to radio and television broadcasting on Sunday; it would halt the trains (no longer steam railroads) and the airlines.

The statutes upon which the information was based follow:

12–21–15. Acts of Sabbath breaking. —The first day of the week being by general consent set apart for rest and religious uses, the following acts are forbidden to be done on that day, the doing of any of which is Sabbath breaking:

1. Servile labor, except work of necessity and charity. The operation of steam railroads, street railways,

telegraph and telephone systems, electric light, gas heat and power systems, livery and feed barns, taxicabs, and buses, automobile garages and filling stations, bakeries, bootblacks stands, popcorn stands, and newspaper plants shall be deemed works of necessity;

2. Public sports, including shooting, sporting horse racing, or other public sports, circuses, and street carnivals. This section shall not apply to baseball when authorized by the governing body of any municipality to be played within the territorial limits of such municipality or by the board of county commissioners when played outside the limits of cities or villages and when conducted in a quiet and orderly manner so as not to interfere with the peace, repose, and comfort of the community and when played after one o'clock p. m. on the Sabbath day more than five hundred feet away from any church edifice;

3. Trades, manufactures, and mechanical employments;

4. All manner of public selling, or offering or exposing for sale publicly, of any commodity, except that meats and fish may be sold at any time before ten o'clock a. m., and foods may be sold to be eaten upon the premises where sold, and drugs, medicines, surgical appliances, milk, ice cream and soda fountain dispensations, fruits, candy and confectionery, tobacco and cigars, newspapers and magazines may be sold at any time of the day. None of said articles or commodities shall be sold in any billard hall, pool hall, bowling alley, saloon, or any other place where gaming of any kind is conducted unless said gaming is discontinued from twelve o'clock midnight on Saturday until six o'clock a. m. on Monday; and

5. Service of legal process of any description, except in cases of breach of the peace or apprehended breach of the peace, or when sued out for the apprehension of a person charged with crime, or when the service is specially authorized by law.

12-21-16. Sabbath breaking—Punishment.—Every person guilty of Sabbath breaking shall be punished by a fine of not less than one dollar nor more than fifty dollars, or by imprisonment in the county jail for not less than one day nor more than twenty days, or by both such fine and imprisonment.

North Dakota Century Code.

Other statutes pertinent to the issues raised in this case read as follows:

12-21-17. Servile labor—Observing other day defense.—It is a sufficient defense in prosecutions for performing servile labor on the first day of the week to show that the accused uniformly keeps another day of the week as holy time and does not labor upon that day, and that the labor complained of was done in such manner as not to interrupt or disturb other persons in observing the first day of the week as holy time.

12-21-18. Maliciously serving or procuring service of process or trial on holy day—Misdemeanor.—Whoever maliciously procures any process in a civil action to be served on Saturday upon any person who keeps Saturday as holy time and does not labor on that day, or serves upon him any process returnable on that day, or maliciously procures any civil action to which such person is a party to be adjourned to that day for trial, is guilty of a misdemeanor.

12-21-19. Sunday dances prohibited—Punishment.—No person shall keep open, run, or permit the running of any place for public dancing, or permit the use of any place for public dancing between the hours of twelve o'clock midnight on

Saturday and sunrise the following Monday morning. Any person violating the provisions of this section is guilty of a misdemeanor, and shall be punished by a fine of not less than twenty-five dollars nor more than fifty dollars for each offense.

12–21–20. Operation of theaters and movies on Sunday lawful.—The operation of theaters showing motion pictures and other theatrical performances for profit or otherwise after 1:15 p. m. on Sunday is lawful.

12–21–21. Bowling permitted on first day of week—When.—Any licensed bowling alley in the state may be operated from and after one o'clock p. m. on the first day of the week, and all necessary labor performed and service rendered in connection therewith is legal and lawful. Any municipality, by ordinance, may prohibit the operating of bowling alleys on the first day of the week.

12–21–22. Operating bathhouses and pleasure boats on Sunday lawful.—It shall be lawful for chautauqua associations, summer resorts, firms, corporations, and private persons to operate bathhouses, bathing beaches, or pleasure boats of all kinds on Sunday.

North Dakota Century Code.

Other sections of the North Dakota Century Code relating to Sunday closing are § 53–01–13, prohibiting boxing, sparring, and wrestling exhibitions on Sunday, and § 40–05–03, permitting cities of certain size to prohibit the operation on Sunday of food markets, stores, and other places where food intended for human consumption is sold at retail.

The argument that the classifications contained in the statute were without rational relation to the object of the legislation was presented to the United States Supreme Court in 1960 in the case of McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393. In that case employees of a large discount department store located on a highway in Maryland were indicted for the Sunday sale in violation of Maryland law of a 3-ring loose-leaf binder, a can of floor wax, a stapler and staples, and a toy submarine. The specific statute under which they were indicted generally prohibited throughout the state the Sunday sale of all merchandise except the retail sale of tobacco products, confectioneries, milk, bread, fruits, gasoline, oil, greases, drugs and medicines, and newpapers and periodicals. Another section of the code prohibited all persons from doing any work or bodily labor on Sunday and prohibited permitting children or servants to work on that day or to engage in fishing, hunting, or unlawful pastimes or recreations. That section excepts all works of necessity and charity. Another section of the Maryland code disallowed the opening or use of any dancing saloon, opera house, bowling alley, or barber shop on Sunday. Special provisions related to Anne Arundel County. Another section generally made unlawful the sale of alcoholic beverages on Sunday; however, other sections provided various immunities for the Sunday sale of different kinds of alcoholic beverages at different hours during the day by vendors holding different types of licenses in different political subdivisions of the state. Other statutory sections provided for a myriad of exceptions for various counties, districts of counties, cities, and towns throughout the state.

■ Chief Justice Warren, speaking for the majority of the court, addressed himself to the point raised as follows:

Appellants argue that the Maryland statutes violate the "Equal Protection" Clause of the Fourteenth Amendment on several counts. First, they contend that the classifications contained in the statutes concerning which commodities may or may not be sold on Sunday are without

rational and substantial relation to the object of the legislation.[2] Specifically, ap-

2. Companion arguments made by appellants are that the exceptions to the Sunday sale's prohibition so undermine the alleged purpose of Sunday as a day of rest as to bear no rational relationship to it and thereby render the statutes violative of due process; that the distinctions drawn by the statutes are so unreasonable as to violate due process.

pellants allege that the statutory exemptions for the Sunday sale of the merchandise mentioned above render arbitrary the statute under which they were convicted. Appellants further allege that § 521 is capricious because of the exemptions for the operation of the various amusements that have been listed and because slot machines, pinball machines, and bingo are legalized and are freely played on Sunday.

The standards under which this proposition is to be evaluated have been set forth many times by this Court. Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. See Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093; Metropolitan Casualty Ins. Co. of New York v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369; Atchison,

T. & S. F. R. Co. v. Matthews, 174 U.S. 96, 19 S.Ct. 609, 43 L.Ed. 909.[3]

3. More recently we declared:
"The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Tigner v. State of Texas, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. The legislature may select one phase of one field and apply a remedy there, neglecting the others. A. F. of L. v. American Sash & Door Co., 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222. The prohibition of the Equal Protection Clause goes no further than the *invidious discrimination.*" Williamson v. Lee Optical, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563. (Emphasis added [by United States Supreme Court].)

It would seem that a legislature could reasonably find that the Sunday sale of the exempted commodities was necessary either for the health of the populace or for the enhancement of the recreational atmosphere of the day—that a family which takes a Sunday ride into the country will need gasoline for the automobile and may find pleasant a soft drink or fresh fruit; that those who go to the beach may wish ice cream or some other item normally sold there; that some people will prefer alcoholic beverages or games of chance to add to their relaxation; that newspapers and drug products should always be available to the public.

The record is barren of any indication that this apparently reasonable basis does not exist, that the statutory distinctions are invidious, that local tradition and custom might not rationally call for this legislative treatment. See Salsburg v. State of Maryland, 346 U.S. 545, 552–553, 74 S.Ct. 280, 284, 98 L.Ed. 281; Kotch v. Board of River Port Pilot Comm'rs, supra. Likewise, the fact that these exemptions exist and deny some vendors

and operators the day of rest and recreation contemplated by the legislature does not render the statutes violative of equal protection since there would appear to be many valid reasons for these exemptions, as stated above, and no evidence to dispel them.

Secondly, appellants contend that the statutory arrangement which permits only certain Anne Arundel County retailers to sell merchandise essential to, or customarily sold at, or incidental to, the operation of bathing beaches, amusement parks et cetera is contrary to the "Equal Protection" Clause because it discriminates unreasonably against retailers in other Maryland counties. But we have held that the Equal Protection Clause relates to equality between persons as such, rather than between areas and that territorial uniformity is not a constitutional prerequisite. With particular reference to the State of Maryland, we have noted that the prescription of different substantive offenses in different counties is generally a matter for legislative discretion. We find no invidious discrimination here. See Salsburg v. State of Maryland, supra.

Thirdly, appellants contend that this same statutory provision, Art. 27, § 509, violates the "Equal Protection" Clause because it permits only certain merchants within Anne Arundel County (operators of bathing beaches and amusement parks et cetera) to sell merchandise customarily sold at these places while forbidding its sale by other vendors of this merchandise, such as appellants' employer. Here again, it would seem that a legislature could reasonably find that these commodities, necessary for the health and recreation of its citizens, should only be sold on Sunday by those vendors at the locations where the commodities are most likely to be immediately put to use. Such a determination would seem to serve the consuming public and at the same time secure Sunday rest for those employees, like appellants, of all other retail establishments. In addition, the enforcement problems which would accrue if large retail establishments, like appellants' employer, were permitted to remain open on Sunday but were restricted to the sale of the merchandise in question would be far greater than the problems accruing if only beach and amusement park vendors were exempted. Here again, there has been no indication of the unreasonableness of this differentiation. On the record before us, we cannot say that these statutes do not provide equal protection of the laws.

McGowan v. State of Maryland [Opinion of the Court], 366 U.S. 420, at 425–428, 81 Sup.Ct. 1101, 6 L.Ed.2d 393. (One footnote omitted.)

 Justice Frankfurter, in a special concurring opinion to *McGowan* and three other decisions concerning Sunday closing statutes then before the Court, stated these arguments and met them in the following manner:

* * * First it is argued that, if the aim of the statutes is to secure a day of peace and repose, the laws of Massachusetts and Maryland, by their exceptions, and the retail sales act of Pennsylvania, by its enumeration of the articles whose sale is forbidden, operate so imperfectly in the service of this aim—show so little rational relation to it—that they must be accounted as arbitrary and therefore violative of due process. The extensive range of recreational and commercial Sunday activity permitted in these States is said to deprive the statutes of any reasonable basis. The distinctions drawn by the laws between what may be sold or done and what may not, it is claimed, are unsupported by reason. Second, these claimants argue that the same discriminations between items which may and may not be sold, and in some cases between the persons who may and those who may not sell identical items, deprive them of the equal protection of the laws.

Although these contentions require the Court to examine separately and with

particularity the provisions of each of the three States' statutes which are attacked, the general considerations which govern these cases are the same. It is clear that in fashioning legislative remedies by fine distinctions to fit specific needs, "The range of the State's discretion is large." Bain Peanut Co. v. Pinson, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482. This is especially so where, by the nature of its subject, regulation must take account of traditional and prevailing local customs. See Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093. "The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." Tigner v. State of Texas, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124. "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. * * * Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. * * * The legislature may select one phase of one field and apply a remedy there, neglecting the others." Williamson v. Lee Optical, Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563.

Neither the Due Process nor the Equal Protection Clause demands logical tidiness. Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 33 S.Ct. 441, 57 L.Ed. 730. No finicky or exact conformity to abstract correlation is required of legislation. The Constitution is satisfied if a legislature responds to the practical living facts with which it deals. Through what precise points in a field of many competing pressures a legislature might most suitably have drawn its lines is not a question for judicial re-examination. It is enough to satisfy the Constitution that in drawing them the principle of reason has not been disregarded. See Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163. And what degree of uniformity reason demands of a statute is, of course, a function of the complexity of the needs which the statute seeks to accommodate.

In the case of Sunday legislation, an extreme complexity of needs is evident. This is so, first, because one of the prime objectives of the legislation is the preservation of an atmosphere—a subtle desideratum, itself the product of a peculiar and changing set of local circumstances and local traditions. But in addition, in the achievement of that end, however formulated, numerous compromises must be made. Not all activity can halt on Sunday. Some of the very operations whose doings most contribute to the rush and clamor of the week must go on throughout that day as well, whether because life depends upon them, or because the cost of stopping and restarting them is simply too great, or because to be without their services would be more disruptive of peace than to have them continue. Many activities have a double aspect: providing entertainment or recreation for some persons, they entail labor and workday tedium for others. [121] Cogent expression

121. Consider Mr. Loftus' comments on the proposed Shops (Sunday Trading Restriction) Bill before the House of Commons in 1936: "During the last 20 years there has been a very great change in the habits of our people—a change for the better. Vast masses of our people, in fact, literally millions, go out into the countryside on fine Sunday afternoons in the Summer, and that is good for their health; it is good for the mind as well as the body that they should do so. Going into the country * * * they have been accustomed to certain facilities in the way of obtaining refreshment, fresh fruit, flowers and vegetables to bring home, and it would be regretted, particularly by the working classes, if there was any interference by legislation that would stop those facilities or check the tendency of our people to go into the country and to take advantage of the amenities of the countryside. * * *

" * * * The first principle is to frame such exemptions as will not unduly interfere with the ordinary health and habits of our people. * * * " 308 H.C.Deb. 2159 (5th ser. 1935–1936).

of the intricate problems which these various countervalent pressures pose was given by Mr. Lloyd in the course of the debate in Commons on the English Sunday closing act of 1936:

"* * * We should all like to see shopkeepers and their staffs as far as possible in a position to observe Sunday in a normal way like most other people. On the other hand, we know that there are certain reasonable needs of the public which require to be met even on a Sunday, and I think we should also all agree that the fewest possible number of people should have to give up their Sunday in order to cater for those public needs. I think we should probably reach a large measure of general agreement on the principle that only those shops should remain open which are essential to meet the requirements of the public and only to the extent that they are essential * * *. Therefore, the problem is to strike a just balance between the reasonable needs of the public and the equally reasonable desire of the great bulk of those engaged in the distributive trades to enjoy their share of Sunday rest and recreation.

"If that is accepted, it follows at once that the crux of any Bill of this kind lies in the scope and the nature of the exemptions to the general principle of closing on Sunday. * * *"[122] Moreover, the

122. Id., at 2200–2201.
McGowan v. State of Maryland [Opinion of Frankfurter, J.], 366 U.S. 420, at 523–526, 81 S.Ct. 1101, at 1188–1189, 6 L.Ed.2d 393.

variation from activity to activity in the degree of disturbance which Sunday operation entails and the similar variation in degrees of temptation to flout the law, and in degrees of ability to absorb and ignore various legal penalties, make exceedingly difficult the devising of effective, yet comprehensively fair, schemes of sanctions.

Justice Frankfurter then discussed the historical development of the Sunday laws,

the significance of the exception for works of necessity and charity, and the difficulty of ascertaining what is necessity:

Early in the history of the Sunday laws there developed mechanisms which served to adapt their wide general prohibitions both to practical exigencies and to the evolving concerns and desires of the public. Where it was found that persons in certain activities tended with particular frequency to engage in violations, those activities were singled out for harsher punishment. On the other hand, practices found necessary or convenient to popular habits were specifically excepted from the ban. Under the basic English Sunday statute, 29 Charles II, c. 7, a wide general exception obtained for "Works of Necessity and Charity"; this provision found its way into the American colonial laws, and has descended into all of their successors currently in force. The effect of the phrase has been to give the courts a wide range of discretion in determining exceptions. But reasonable men can and do differ as to what is "necessity." In every jurisdiction legislatures, presumably deeming themselves fitter tribunals for decisions of this sort than were courts, acted to resolve the question against, or in favor of, various particular activities. Some pursuits were expressly declared not works of necessity, or were specially banned. Others were expressly permitted: series of exceptions, giving the laws resiliency in the course of cultural change, proliferated.[130] Today,

130. One may trace in these exceptions the evolving habits of life of the people. Compare State v. Hogreiver, 152 Ind. 652, 53 N.E. 921, 45 L.R.A. 504 (1899), sustaining a statute specifically prohibiting Sunday baseball, with Carr v. State, 175 Ind. 241, 93 N.E. 1071, 32 L.R.A., N.S., 1190 (1911), sustaining a statute excepting baseball from the general Sunday prohibition.

as appendix II to this opinion, 366 U.S. 551, 81 S.Ct. 1201, shows, the general pattern in over half of the States and in England is similar. Broad general prohibitions are qualified by numerous precise

exemptions, often with provision for local variation within a State, and are frequently bolstered by special provisions more heavily penalizing named activities. The regulations of Maryland, Massachusetts and Pennsylvania are not atypical in this regard, although they are undoubtedly among the more complex of the statutory patterns.

The degree of explicitness of these provisions in so many jurisdictions demonstrates the intricacy of the adjustments which they are designed to make. * * *

McGowan v. State of Maryland [Opinion of Frankfurter, J.], 366 U.S. 420, at 526–530, 81 S.Ct. 1101, at 1189–1191, 6 L.Ed.2d 393. (Some footnotes omitted.)

Justice Frankfurter, after conceding that, unlike their virtually unanimous attitude on the issue of religious freedom, state courts have not always sustained Sunday legislation against the charge of unconstitutional discrimination, said:

* * * Statutes and ordinances have been struck down as arbitrary or as violative of state constitutional prohibitions of special legislation. A far greater number of courts, in similar classes of cases, have sustained the legislation. But the very diversity of judicial opinion as to what is reasonable classification—like the conflicting views on what is such "necessity" as will justify Sunday operations—testifies that the question of inclusion with regard to Sunday bans is one where judgments rationally differ, and hence where a State's determinations must be given every fair presumption of a reasonable support in fact. The restricted scope of this Court's review of state regulatory legislation under the Equal Protection Clause, U.S.Const. Amend. 14 is of long standing. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–341, 55 L.Ed. 369. The applicable principles are that a state statute may not be struck down as offensive of equal protection in its

schemes of classification unless it is obviously arbitrary, and that, except in the case of a statute whose discriminations are so patently without reason that no conceivable situation of fact could be found to justify them, the claimant who challenges the statute bears the burden of affirmative demonstration that in the actual state of facts which surround its operation, its classifications lack rationality.

McGowan v. State of Maryland [Opinion of Frankfurter, J.], 366 U.S. 420, at 531–535, 81 S.Ct. 1101, at 1192–1194, 6 L.Ed.2d 393. (Footnotes omitted.)

■ In answering the argument that the Maryland statute was rendered arbitrary by its exceptions, Justice Frankfurter said:

* * * The exceptions relate to products and services which a legislature could reasonably find necessary to the physical and mental health of the people or to their recreation and relaxation on a day of repose. Other sales activity and, under Art. 27, § 492, all other labor, are forbidden. That more or fewer activities than fall within the exceptions could with equal rationality have been excluded from the general ban does not make irrational the selection which has actually been made. There is presented in this record not a trace of evidence as to the habits and customs of the population of Maryland or of Anne Arundel County, nothing that suggests that the pattern of legislation which their representatives have devised is not reasonably related to local circumstances determining their ways of life. Appellants have wholly failed to meet their burden of proof.

McGowan v. State of Maryland [Opinion of Frankfurter, J.], 366 U.S. 420, at 536–537, 81 S.Ct. 1101, at 1195, 6 L.Ed. 2d 393.

■ In discussing the statute attacked in the case of Gallagher v. Crown Kosher

Super Market, 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536, Justice Frankfurter pointed out that a statute is not to be struck down on the supposition that various differently treated situations may in fact be the same:

> \* \* \* These various differently treated situations may be different in fact, or they may not. A statute is not to be struck down on supposition.

McGowan v. State of Maryland, supra, 366 U.S. 420, at 539, 81 S.Ct. 1101, at 1196.

Referring to Williamson v. Lee Optical, Inc., 348 U.S. 483, at 489, 75 S.Ct. 461, 99 L.Ed. 563, Justice Frankfurter pointed out that the prohibition of the Equal Protection Clause goes no further than the invidious discrimination. McGowan v. State of Maryland, supra, 366 U.S. 420, at 540, 81 S.Ct. 1101.

Although the statutes of Maryland, Pennsylvania, and Massachusetts vary in certain immaterial respects from our statutes on Sunday closing, they are similar in material respects. We believe that the objections raised by Tempo in the instant case are similar to the objections raised by the various parties in McGowan v. State of Maryland, supra; Two Guys from Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551; Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563; and Gallagher v. Crown Kosher Super Market, supra, which objections were very carefully analyzed by the United States Supreme Court and found not to violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

■ Applying the rules described herein as set forth by the United States Supreme Court, we find no invidious discrimination in the instant case. Accordingly, we hold that § 12–21–15, N.D.C.C., does not violate the Fourteenth Amendment to the United States Constitution or § 20 of the North Dakota Constitution.

There is also no basis in the record for finding, as Tempo would have us do, that there has been such discriminatory enforcement of the Sunday closing statute that the enforcement of the statute should be enjoined or the statute should be declared unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.

In support of its argument in this respect Tempo referred the Court to the cases of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; East Coast Lumber Terminal v. Town of Babylon, 174 F.2d 106, 8 A.L.R.2d 1219 (2d Cir. 1949); Louisville & Nashville R. Co. v. Faulkner, 307 S.W.2d 196 (Ky.1957); and United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234.

We have carefully studied *Yick Wo* and believe that it is clearly distinguishable from the instant case. In *Yick Wo* the Supreme Court found that the ordinance under consideration conferred, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places but as to persons. The Court said that in that case they were not obliged to reason from the probable to the actual and pass upon the validity of the ordinances complained of, as tried merely by the opportunties which their terms afforded of unequal and unjust discrimination in their administration, for the cases presented the ordinances in actual operation, and the facts established an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they were applied by the public authorities charged with their administration with a mind so unequal and oppressive as to amount to a practical denial by the state of the equal protection of the laws.

The Court found that the petitioners, who were applicants for licenses to operate laundries within wooden buildings, had complied

with every requisite deemed by the law or by the public officers charged with its administration necessary for the protection of neighboring property from fire or as a precaution against injury to the public health, and that no reason whatever except the will of the supervisors was assigned why they should not be permitted to carry on in the accustomed manner their harmless and useful occupation on which they depended for a livelihood. The Court further found that, while this consent of the supervisors was withheld from them and from two hundred others, all of whom happened to be Chinese subjects, eighty others not Chinese subjects were permitted to carry on the same business under similar conditions. The Court found this discrimination a denial of the equal protection of the laws and a violation of the Fourteenth Amendment to the Constitution.

■ Citing other federal decisions as authority the Court said:

* * * Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution. * * *

Yick Wo v. Hopkins, 118 U.S. 356, at 373–374, 6 S.Ct. 1064, at 1073, 30 L.Ed. 220.

■ In the instant case there is no evidence indicating that others in the same category as Tempo were permitted to be open on Sunday while Tempo was prohibited from being open. We do not believe that purposeful or intentional discrimination such as would constitute a denial of equal protection could be found without such a showing.

Chief Judge Learned Hand, speaking for the United States Court of Appeals, Second Circuit, in East Coast Lumber Terminal v. Town of Babylon, supra, merely acknowledged that it had been the law for over sixty years that the Fourteenth Amendment covered the unequal enforcement of valid laws as well as any enforcement of invalid laws.

Tempo bases its contention that it has been unlawfully discriminated against in being prosecuted for its violation of the Sunday closing law partly on the testimony of the sheriff of Ward County that the law is generally not enforced in the City of Minot; that subsection 2 of § 12–21–15, relating to the prohibition of public sports, is not enforced; that no attempt is made to enforce the law as it might apply to the operations of the state fair on Sundays; and that he believed "a lot of laws are enforced such as this law by perhaps public opinion or where there might be infringement, as in this particular case, on other businesses." Part of his testimony follows:

Q. You don't think it's the purpose of the law nor of your office to protect a particular business or businessman, do you?

A. No.

Q. Did your answer seem to indicate that that is a factor though in the enforcement of the law?

A I believe this would be indirectly that it has some bearing.

It also relies on the testimony of the deputy sheriff of Ward County that the midway at the fairground consists of a large carnival, which offers rides, shows, and contests; that food, soft drinks, souvenirs, and merchandise are sold on the fairgrounds; and that the Nodak Racing Club races on the fairgrounds.

■ This testimony indicates a general laxity on the part of the sheriff and his deputy in enforcing sections of the act other than the section under which Tempo was prosecuted. It does not disclose an intentional or a purposeful discrimination

against Tempo. Mere laxity in the enforcement of a criminal statute is not a denial of the equal protection of the laws. See: State v. Hicks, 213 Or. 619, 325 P.2d 794, cert. denied 359 U.S. 917, 79 S.Ct. 594, 3 L.Ed.2d 579; Sims v. Cunningham, 203 Va. 347, 124 S.E.2d 221, cert. denied 371 U.S. 840, 83 S.Ct. 68, 9 L.Ed.2d 76. Other cases concerning this issue are: Wade v. City and County of San Francisco, 82 Cal. App.2d 337, 186 P.2d 181; State v. Solomon, 245 S.C. 550, 141 S.E.2d 818, appeal dismissed 382 U.S. 204, 86 S.Ct. 396, 15 L.Ed.2d 270.

As was said by the Chief Judge of the United States Court of Appeals, Second Circuit, in a decision rendered in 1963:

> Mere failure to prosecute other offenders is no basis for a finding of denial of equal protection. See United States v. Rickenbacker, 309 F.2d 462 (2 Cir. 1962). To show that unequal administration of a state statute offends the equal protection clause one must show an intentional or purposeful discrimination. Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

Moss v. Hornig, 314 F.2d 89 at 92 (2d Cir. 1963).

In that case Mr. Moss, who operated a shoe store in Brookfield, Connecticut, was charged with keeping his store open on Sunday. He sought to enjoin Mr. Hornig, the Prosecuting Attorney, from prosecuting him.

> In the instant case, Moss alleged an intentional or purposeful discrimination against him as an individual. We are not convinced that the Oyler case [Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446] precludes our granting relief if a plaintiff can show that a state official purposefully discriminated against him. However, Moss has made no such showing. He evoked testimony that only two persons, including himself, had been prosecuted in the Third Circuit

since 1961, that Hornig knew other stores were open, and that Hornig failed to bring other prosecutions. These facts do not prove purposeful discrimination.

Moss v. Hornig, supra, 314 F.2d at 93.

It is clear that Tempo has failed to show an arbitrary and intentionally unfair discrimination in the administration of the law as in Yick Wo v. Hopkins, 118 U.S. 356, at 374, 6 S.Ct. 1064, 30 L.Ed. 220. There has been no offer to show that the circumstances of the state fair or others generally referred to were so much alike as to render any discrimination in the application of the law equivalent to a denial of the equal protection of the laws. See Mackay Telegraph & Cable Co. v. City of Little Rock, 250 U.S. 94, at 100, 39 S.Ct. 428, 63 L.Ed. 863. The burden of proving intentional or purposeful discrimination in the enforcement of a law is upon the party attempting to have the statute set aside. In this case the burden falls upon Tempo, and it is our view that it has failed in its proof.

We conclude our consideration of this phase of the appeal with a quotation from American Jurisprudence which we believe to be pertinent:

> Mere errors of judgment by officials will not support a claim of discrimination violative of constitutional guaranties of equality. Moreover, it is not enough to show that a law or ordinance has not been enforced against other persons as it is sought to be enforced against the person claiming discrimination. Mere laxity in the administration of the law, no matter how long continued, is not and cannot be held to be a denial of the equal protection of the law. To establish arbitrary discrimination inimical to constitutional equality, there must be something more, something which in effect amounts to an intentional violation of the essential principle of practical uniformity. * * *

16 Am.Jur.2d Constitutional Law § 541 (1964).

The second major argument made by Tempo in its appeal is that § 12–21–15, N.D. C.C., violates Article I of the Amendments to the United States Constitution as a prohibited law respecting an establishment of religion.

We start our consideration of this question with a quotation from the opinion written by Justice Black in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392:

The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State." Reynolds v. United States, 98 U.S. 145, at 164, 25 L.Ed. 244.

\* \* \* \* \* \*

\* \* \* That Amendment [the First] requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them.

Everson v. Board of Education, supra, 330 U.S. 1, at 15–18, 67 S.Ct. 504, at 511–513.

*Everson* held that the statute authorizing district boards of education to make rules and contracts for the transportation of children to and from schools other than private schools operated for profit and a resolution adopted by a board of education pursuant to said statute authorizing the reimbursement of parents for fares paid for the transportation by public carrier of children attending public and Catholic schools did not violate the provision of the First Amendment made applicable to the states by the Fourteenth Amendment prohibiting any law respecting an establishment of religion.

Tempo states that the question which arises here is "whether our Sunday law is social welfare rather than religious in nature." In support of its contention that the statute is religious in nature and therefore must be struck down, it refers us to the introductory phrases of § 12–21–15, which read: "The first day of the week being by general consent set apart for rest and religious uses, the following acts are forbidden to be done on that day, the doing of any of which is Sabbath breaking." It also directs our attention to the language this court used in the case of State ex rel. Temple v. Barnes, 22 N.D. 18, 132 N.W. 215, 37 L.R.A.,N.S., 114, in which we said:

\* \* \* A number of the courts of the different states have passed upon this question, and have held that this is a Christian nation, and that laws enacted to prevent the desecration of the Sabbath are valid for that reason, notwithstanding constitutional provisions similar to section 4, supra, and others peculiar to different states. \* \* \*

\* \* \* Judge Story asserts that the Christian religion is the religion of liberty, and may well be regarded as the true basis of our popular form of government, and that at the adoption of the Constitution, and the amendment to it which provides that Congress shall pass no law re-

specting an establishment of religion or prohibiting the free exercise thereof, it was probably the universal sentiment in America that Christianity should receive the support of the state, so far as was consistent with the general freedom of conscience and religious worship. The real object of the amendment respecting religion was to prevent the establishment of a hierarchy which would control the exclusive patronage of the government; and it may well be conceived that a proper recognition of the prevailing faith, supported by no compulsory acceptance of its doctrines or attendance upon its rites, would still be within constitutional limits, as the amendment to the federal Constitution embodies the idea embraced in the Constitutions of the states. Story on the Constitution, §§ 1873, 1874, 1877.

State ex rel. Temple v. Barnes, supra, at 216–217.

Tempo contends that a further indication that our statute is religious in nature is shown by the use of the words "holy time" in § 12–21–17 and by the fact that §§ 12–21–15 and 12–21–16 appear in the Century Code under the chapter entitled "Offenses Against Religion and Conscience." It concludes this argument with the statement that § 12–21–15 has the effect of aiding one religion, namely the Sunday-observing Christian religion, in preference to those religions which observe a holy day other than Sunday, and that it is therefore unconstitutional.

Before discussing this proposition generally, we should like to point out that, although this court in the 1911 case of State ex rel. Temple v. Barnes indicated through historical references that the Sunday-closing laws in this country had a religious origin, it nevertheless found that our statute which prohibited the running of a theater on Sunday did not contravene the establishment of religion clause of the First Amendment. In so concluding this court said:

* * * It is plain to us that this statute, if invalid, must accomplish one of

five things: First, it must work an establishment of a religion; second, provide for compulsory support, by taxation or otherwise, of religious instruction; third, make attendance upon religious worship compulsory; fourth, work a restriction upon the exercise of religion according to the dictates of conscience; or fifth, impose restrictions upon the expression of religious belief. * * *

State ex rel. Temple v. Barnes, supra, at 219.

Finding that the statute complained of did none of those things, the Court found the statute valid as against the objection considered.

Chief Justice Warren, speaking for the majority in McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393, met the argument that the language of the statutes and the early judicial decisions substantiated the establishment argument by saying that there was no dispute that the original laws which dealt with Sunday labor were motivated by religious forces but said that what must be decided now is whether present Sunday legislation, having undergone extensive changes from the earliest forms, still retains its religious character. He traced the Sunday closing laws back to the 13th century when, in 1237, Henry III forbade the frequenting of markets on Sunday. He pointed out that, despite the strongly religious origin of the Sunday closing laws, beginning before the 18th century non-religious arguments for Sunday closing began to be heard more distinctly, and the statutes began to lose some of their totally religious flavor. He noted that proponents of Sunday closing legislation are no longer exclusively representatives of religious interests, as evidenced by recent New Jersey Sunday legislation which was supported by labor groups and trade associations, and by the promotion of modern English Sunday legislation by the National Federation of Grocers, the National Chamber of Trade, the Drapers Chamber of Trade, and the National Union of Shop

Assistants. He stressed further that throughout the years state legislatures have modified, deleted from, and added to their Sunday statutes. He observed that litigation over Sunday closing laws is not novel, and that, although scores of cases may be found in the state appellate courts relating to sundry phases of Sunday enactments and although religious objections have been raised there on numerous occasions, they have been sustained only once, in Ex parte Newman, 9 Cal. 502 (1858), and that that decision was overruled three years later in Ex parte Andrews, 18 Cal. 679 (1861).

 Chief Justice Warren further pointed out that the United States Supreme Court had considered the happenings surrounding the Virginia General Assembly's enactment in 1785 of "An act for establishing religious freedom," 12 Hening's Statutes of Virginia 84, written by Thomas Jefferson and sponsored by James Madison, as best reflecting the long and intensive struggle for religious freedom in America and as particularly relevant in the search for the First Amendment's meaning. He emphasized that in 1799 Virginia pronounced the act as "a true exposition of the principles of the bill of rights and constitution," and repealed all subsequently enacted legislation deemed inconsistent with it, but that Virginia's statute banning Sunday labor stood. It was his view that the Establishment of Religion Clause of the First Amendment to the Constitution does not ban federal or state regulation of conduct the reason or effect of which merely happens to coincide with the tenets of some or all religions. In support of this view he said:

 *. * * In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demands such regulation. Thus, for temporal purposes, murder is illegal. And the fact that this agrees with the dictates of the Judaeo-Christian religions while it may disagree with others does not in-

validate the regulation. So too with the questions of adultery and polgamy. Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637; Reynolds v. United States [98 U.S. 145, 25 L.Ed. 244]. The same could be said of theft, fraud, etc., because those offenses were also proscribed in the Decalogue.

McGowan v. State of Maryland [Opinion of the Court], 366 U.S. 420, at 442, 81 S.Ct. 1101, at 1114, 6 L.Ed.2d 393.

In reviewing the Maryland statutes he found that the title of the major series of sections of the Maryland code dealing with Sunday closing is "Sabbath Breaking"; that a certain section proscribed work or bodily labor on the "Lord's Day," and forbade persons to "profane the Lord's Day" by gaming, fishing, etc.; that another section referred to Sunday as the "Sabbath Day"; that many of the exempted Sunday activities could be conducted only during the afternoon and late evening, times when Christian church services were normally not held; and, finally, that certain localities did not permit allowed Sunday activities to be carried on within one hundred yards of any church where religious services were being held. He also found that some judicial statements in early Maryland decisions tended to support the contention that the statutes had a religious purpose. In spite of these facts, by considering the language and operative effect of the current statutes, he found that their purpose was that of providing a Sunday atmosphere of recreation, cheerfulness, repose, and enjoyment, rather than one of religion.

 Analyzing our North Dakota statutes on Sunday closing, we find a parallel. It would appear that our statutes may have had a religious origin, that even today some of the statutes contain language of a religious significance, and that our decision in State ex rel. Temple v. Barnes, 22 N.D. 18, 132 N.W. 215, seems to quote Judge Story's views with some approval. Even so, the fact that our Sunday closing statutes now permit the operation on Sunday of

theaters showing motion pictures and other theatrical performances for profit or otherwise, the operation on Sunday of bowling alleys, and the operation on Sunday by Chautauqua associations, summer resorts, firms, corporations, and private persons of bath houses, bathing beaches, and pleasure boats of all kinds, indicates that the basic purpose of the Sunday closing laws in North Dakota today is the same as it has been determined to be in Maryland and many other states, that is, rest and recreation. We therefore conclude, as the Maryland court did, that the present purpose of our Sunday closing statutes is, not to aid religion, but to set aside a day of rest and recreation.

The third argument made by Tempo in its brief is that § 12–21–15, N.D.C.C., violates Article I of the Amendments to the United States Constitution and § 4 of the North Dakota Constitution, as a law prohibiting the free exercise of religion.

This argument we need not consider, as Tempo alleges only economic injury to it as a corporation, and does not allege infringement of a specific religion embraced by its stockholders, employees, or customers. As the general rule is that a litigant may assert only his own constitutional rights or immunities and as Tempo has presented no weighty countervailing policies here to cause an exception to the general rule, we hold that it has no standing to raise the contention that the statute prohibits the free exercise of religion contrary to the First Amendment to the United States Constitution. McGowan v. State of Maryland, 366 U.S. 420, at 429, 81 S.Ct. 1101, 6 L.Ed.2d 393.

We accordingly affirm the judgment of the trial court.

TEIGEN, C. J., and KNUDSON and MURRAY, JJ., concur.

STRUTZ, Judge (concurring specially).

While I fully concur in the well-written opinion of the majority in this case, and although I realize that the appellant has not urged that the designation of a day of rest is not a proper exercise of the police power of the State, I do believe it is well to point out, in addition to what has been said by the majority, that the principle which permits the doing of certain work and business on the first day of the week, and which prohibits the doing of other work on that day, is that the State, as the sovereign and in the exercise of its police power, does have the absolute right to prescribe a day of rest in the interests of the health and morals of its people. State v. Diamond, 56 N.D. 854, 219 N.W. 831. It may be true that any other day would be as suitable as the first day of the week as such day of rest. But the State of North Dakota, through its Legislative Assembly, has the right to designate which day shall be observed as the day of rest. The mere fact that the Legislature has designated as such day one which most of its citizens also observe as a religious day, does not, by reason of that fact, make the designation of the first day of the week unlawful and in violation of the establishment-of-religion clause of the First Amendment of the United States Constitution.

Since the appellant has not shown that the issues involved in this lawsuit violate any provisions of the Federal or State constitutions, the decision of the county court is properly affirmed.